# IN THE SUPREME COURT OF CALIFORNIA

JANICE JARMAN,

Plaintiff and Appellant,

v.

HCR MANORCARE, INC., et al.,

Defendants and Appellants.

S241431

Fourth Appellate District, Division Three
G051086

Riverside County Superior Court
RIC10007764

August 17, 2020

Justice Chin authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Kruger, and Groban concurred.

Justice Cuéllar filed a dissenting opinion, in which Justice Liu concurred.

JARMAN v. HCR MANORCARE, INC.

S241431

Opinion of the Court by Chin, J.

Health and Safety Code[1] section 1430, subdivision (b) gives a current or former nursing care patient or resident the right to bring a private cause of action against a skilled nursing facility for violating certain regulations. The available remedies include injunctive relief, costs and attorney fees, and "up to five hundred dollars ($500)" in statutory damages. The question we address is whether the monetary cap of $500 is the limit in each action or instead applies to each violation committed.

For reasons that follow, we conclude that section 1430, subdivision (b)'s $500 cap applies per action, not per regulatory violation.

FACTUAL AND PROCEDURAL BACKGROUND

In early 2008, John Jarman, then 91 years old, fractured his left hip after slipping and falling as he climbed out of a swimming pool. After undergoing surgery to place a rod in his leg, John[2] was transferred from the hospital to Manor Care of Hemet, CA, LLC, a skilled nursing facility of HCR ManorCare, Inc. (collectively, Manor Care) on March 17, 2008. John could

---

[1]     All statutory provisions are to the Health and Safety Code unless otherwise noted.

[2]     To avoid confusion, we refer to John Jarman by his first name when discussing the facts leading up to the lawsuit. (See *post*, p. 2 [explaining that John died after filing his lawsuit, and is now represented by his daughter as successor in interest].)

not move or get up on his own, and required full assistance with daily activities, which included dressing, eating, toilet use, hygiene, and bathing. During John's three-month stay, Manor Care staff allegedly often left him in soiled diapers, ignored nurse call lights, and caused John to suffer other neglect and indignities. John was discharged from Manor Care on June 16, 2008.

On April 26, 2010, John filed a complaint alleging three causes of action, i.e., violations of the "Patients Bill of Rights" (Health & Saf. Code, § 1430, subd. (b), citing Cal. Code Regs., tit. 22, § 72527); elder abuse and neglect; and negligence. The complaint alleged that despite knowing that John was at "a high risk for skin breakdown," Manor Care failed to take preventative measures and instead often left him in soiled diapers; as a result, John suffered from significant skin excoriation and bedsores which took over a year to heal after he was discharged. It also alleged that John suffered from other forms of abuse and neglect. John died before trial began, and his daughter, Janice Jarman, represented him as his successor in interest. References to "Jarman" are to both John and Janice unless otherwise noted.

At the close of Jarman's case in chief, Manor Care moved to strike the request for punitive damages from the complaint. The trial court denied the motion. On June 15, 2011, the jury awarded Jarman $100,000 in damages and $95,500 in statutory damages, i.e., $250 for each of the 382 violations. The jury also answered "yes" to the question whether "[d]efendant engaged in conduct that caused harm to the plaintiff with malice, oppression or fraud." Based on concerns regarding the sufficiency of the evidence, the trial court later struck the punitive damages claim.

Manor Care subsequently made a motion for a partial judgment notwithstanding the verdict, or alternatively, to correct the judgment. Based on a complicated procedural history not relevant to the issue here, the trial court's judgment was not entered until over three years later, on September 9, 2014. On remand, the trial court entered judgment against Manor Care in the amount of $195,500 and subsequently awarded Jarman $368,755 in attorney fees. Both Jarman and Manor Care appealed.

The Court of Appeal agreed with Jarman that the trial court erred in striking the jury's finding that Manor Care acted with malice, oppression, or fraud. It rejected Manor Care's claim that Jarman was limited to $500 in statutory damages, and instead reasoned that the $500 cap applied to each cause of action. The court remanded the matter to the trial court to conduct further proceedings to determine the amount of punitive damages Jarman was entitled to based on the 382 regulatory violations. (*Jarman v. HCR ManorCare, Inc.* (2017) 9 Cal.App.5th 807.) We granted review.

## DISCUSSION

This state has long recognized nursing care patients as "one of the most vulnerable segments of our population" and "in need of the safeguards provided by state enforcement of patient care standards." (*California Assn. of Health Facilities v. Department of Health Services* (1997) 16 Cal.4th 284, 295 (*Health Facilities*).) To that end, the Legislature enacted the Long-Term Care, Health, Safety, and Security Act of 1973 (Long-Term Care Act or Act; § 1417 et seq.). Almost a decade later, the Legislature enacted the Elder Abuse and Dependent Adult Civil Protection Act (Elder Abuse Act; Welf. & Inst. Code,

§ 15600 et seq.)), the specific purpose of which is "to protect a particularly vulnerable portion of the population from gross mistreatment in the form of abuse and custodial neglect." (*Delaney v. Baker* (1999) 20 Cal.4th 23, 33 (*Delaney*).)

This case turns on the interpretation of section 1430, subdivision (b) (section 1430(b)), which is part of the Long-Term Care Act. "Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737.)

In relevant part, section 1430(b) provides that a current or former patient of a skilled nursing facility "may bring a civil action against the licensee of a facility who violates any rights of the resident or patient as set forth in the Patients Bill of Rights in Section 72527 of Title 22 of the California Code of Regulations, or any other right provided for by federal or state law or regulation. . . . *The licensee shall be liable for up to five hundred dollars ($500),* and for costs and attorney fees, and may be enjoined from permitting the violation to continue . . . ." (Italics added.) (Added by Stats. 1982, ch. 1455, § 1, p. 5599

4

[adding subd. (b) to § 1430]; amended by Stats. 2004, ch. 270, § 2, p. 3139 [adding the term "current or former" patient and the phrase "any other right provided for by federal or state law or regulation"].)

The parties' disagreement centers on the phrase, "[t]he licensee shall be liable for up to five hundred dollars ($500)." (§ 1430(b).) The statute does not explain how the $500 cap is calculated. Is the cap applied to each violation committed, or is $500 the maximum award of statutory damages in each lawsuit brought? Manor Care argues that section 1430(b) "on its face" authorizes a single maximum $500 award because the provision states only that a resident may bring a "civil action," and nowhere mentions that the $500 cap applies "per violation" or "per cause of action." Significantly, Manor Care contends the Legislature has included the term "per violation" or "each violation" in other related contexts (e.g., §§ 1280.1, subd. (a) ["per violation"], 1317.6, subd. (c) ["each violation"], 1548, subd. (b) ["each violation"]), which suggests its omission from section 1430(b) was intentional. (See *People v. Arriaga* (2014) 58 Cal.4th 950, 960.)

For her part, Jarman maintains the provision is ambiguous, i.e., it does not *compel* a conclusion that the maximum award is $500, nor does it *foreclose* the alternative of a $500 cap for each violation. Advancing a policy argument, she asserts that unless the $500 cap is assessed for each violation, a care facility could commit multiple violations "with impunity" against a resident, knowing it would be liable for a total of only $500. Jarman underscores that because the Long-Term Care Act is a remedial statute, it must "be liberally construed on behalf of the class of persons it is designed to protect." (*Health*

5

*Facilities*, *supra*, 16 Cal.4th at p. 295.) The respective amici curiae largely echo these divergent arguments.

We agree that the language of section 1430(b) is far from clear; even a careful parsing offers little insight. (Cf. *Nevarrez v. San Marino Skilled Nursing & Wellness Centre, LLC* (2013) 221 Cal.App.4th 102, 131 (*Nevarrez*) [finding party's reliance on "syntax" of § 1430(b) to be "frustrated by the intervening reference to 'costs and attorney fees' "].)[3] In the face of this ambiguity, we look to the Long-Term Care Act as a whole, to determine the legislative intent underlying section 1430(b). (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 ["The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible."].) We are mindful that " '[t]hose who write statutes seek to solve human problems. Fidelity to their aims requires us to approach an interpretive problem not as if it were a purely logical game, like a Rubik's Cube, but as an effort to divine the human intent that underlies the statute.' " (*Burris v. Superior Court* (2005) 34 Cal.4th 1012, 1017.)

---

[3] Although the statutory text does not clearly indicate whether the Legislature intended a per-lawsuit or per-violation $500 cap, the statutory text in any event does not support the Court of Appeal's conclusion that the cap applies per cause of action. Further, to the extent the cause of action approach may raise practical difficulties similar to those posed by the per violation approach, which we discuss below (see *post*, at pp. 20–21), we are persuaded that the $500 cap is better understood to apply per lawsuit.

With this perspective, we discuss the statutory scheme in greater detail below.

## A. Long-Term Care Act

The Long-Term Care Act is a "detailed statutory scheme regulating the standard of care provided by skilled nursing facilities to their patients." (*Kizer v. County of San Mateo* (1991) 53 Cal.3d 139, 143 (*Kizer*); see § 1422, subd. (a) [legislative findings and declarations].) The Act establishes a citation system, an inspection and reporting system, and a provisional licensing mechanism, all of which the Department of Public Health (Department) is charged with administering. (§ 1417.1; see *Kizer*, at p. 143.) " 'Under its licensing authority, the Legislature has mandated standards to ensure quality health care. The regulations establish that what the Legislature and the Department are seeking to impose are measures that protect patients from actual harm, and encourage health care facilities to comply with the applicable regulations and thereby *avoid* imposition of the penalties.' " (*Health Facilities*, *supra*, 16 Cal.4th at p. 295, quoting *Kizer*, at p. 148.)

Citations issued by the Department are "classified according to the nature of the violation." (§ 1424; see also § 1424.5, subd. (a).) Class "A" violations are violations that the Department has determined present an imminent danger or a substantial probability "that death or serious physical harm to patients or residents of the long-term health care facility would result therefrom." (§ 1424, subd. (d).) Class "AA" violations are Class A violations that are the "direct proximate cause" of a patient's death. (*Id.*, subd. (c).) Class "B" violations are those that "have a direct or immediate relationship to the health, safety, or security of long-term health care facility patients or

residents, other than class 'AA' or 'A' violations." (*Id.*, subd. (e).) Class "C" violations are violations "relating to the operation or maintenance of a skilled nursing facility which the Department determines has only a minimal relationship to the health, safety or security" of long-term care patients. (Cal. Code Regs., tit. 22, § 72701, subd. (a)(4); see *Nevarrez*, *supra*, 221 Cal.App.4th at p. 131.)

With respect to the Long-Term Care Act's inspection and citation process, it operates "to encourage compliance with state mandated standards for patient care and to deter conduct which may endanger the well-being of patients." (*Kizer*, *supra*, 53 Cal.3d at p. 150.) In effect, the scheme "serves to punish by naming and shaming facilities that violate the law." (*State Dept. of Public Health v. Superior Court* (2015) 60 Cal.4th 940, 950; cf. § 1422, subd. (a) [legislative finding that inspections are the "most effective means" to implement protective state policy].) Although its authorization of civil penalties (see e.g., §§ 1424, 1424.5, 1425, 1428) has a "punitive or deterrent aspect," the Long-Term Care Act is nonetheless remedial and its central focus is "preventative." (*Kizer*, *supra*, 53 Cal.3d at pp. 147–148, italics omitted.) With this administrative authority to license and inspect facilities, issue citations, and impose civil penalties, the Department serves as "the primary enforcer of standards of care in the long-term care facilities of this state." (*Health Facilities*, *supra*, 16 Cal.4th at p. 305, fn. 7; see *Kizer*, *supra*, 53 Cal.3d at p. 142.)

## B. Patients Bill of Rights

In addition to protective standards of care designed to provide quality health care (see *Health Facilities*, *supra*, 16 Cal.4th at p. 295), nursing care patients are entitled to

"fundamental human rights" set out in the Patients Bill of Rights. (Cal. Code Regs., tit. 22, § 72527 [regulatory version]; § 1599.1 [statutory version].) These rights include the right "[t]o be free from discrimination" and the right "[t]o be free from mental and physical abuse." (Cal. Code Regs., tit. 22, § 72527, subd. (a)(8), (10).) A nursing care patient is "[t]o be fully informed" of the rights governing patient conduct, of all services available in the facility and related charges, and of his or her total health status. (*Id.*, subd. (a)(1), (2), (3).) A patient must also receive material information related to any proposed treatment or procedure (*id.*, subd. (a)(5)), and be encouraged to voice grievances and suggest any changes to policies and services (*id.*, subd. (a)(7)). Certain rights in the Patients Bill of Rights are also "expressed as aggregate, facility-wide obligations." (*Shuts v. Covenant Holdco LLC* (2012) 208 Cal.App.4th 609, 620 (*Shuts*), citing § 1599.1.) For instance, a facility must employ an adequate staff, provide residents appropriate food, support an activity program to encourage residents' self-care, and maintain an operating nurses' call system. (§ 1599.1, subds. (a), (c), (d), (f); see *Shuts*, at p. 620.)

When adopted by regulation in 1975 and later enacted into statute in 1979, however, the Patients Bill of Rights did not include its own mechanism for enforcement with respect to any violations. (*Health Facilities*, *supra*, 16 Cal.4th at p. 302; § 1599.1; see Cal. Code Regs., tit. 22, §§ 72527, 72701, subd. (a)(4); *Nevarrez*, *supra*, 221 Cal.App.4th at p. 135.) While section 1430, subdivision (a) (section 1430(a); formerly section 1430) authorized the Attorney General or other interested party to initiate private actions for damages or to seek an injunction against a nursing care facility, its reach was limited.

As discussed further below (see *post*, at pp. 16–17), section 1430(a) (formerly section 1430) applied only if the Department failed to take action based on a facility's class A or B violation (§ 1424, subds. (c)–(e)), and the violation was not corrected to the Department's satisfaction. (§ 1430(a), added by Stats. 1973, ch. 1057, § 1, p. 2093; see *Health Facilities*, *supra*, 16 Cal.4th at p. 302.) By its terms, section 1430(a) does *not* extend to class C violations. (See *Nevarrez*, *supra*, 221 Cal.App.4th at p. 131.)

### C. Section 1430(b)

In 1982, the Legislature added subdivision (b) to section 1430 allowing "skilled nursing facility residents *themselves* to bring actions to remedy violations of their rights rather than forcing them to depend upon the [Department] to take action." (*Shuts*, *supra*, 208 Cal.App.4th at pp. 623–624.) Specifically, section 1430(b) cross-referenced the Patients Bill of Rights (Cal. Code Regs., tit. 22, § 72527), which in turn incorporated section 1599.1. (§ 1430(b), added by Stats. 1982, ch. 1455, § 1, p. 5599; see § 1599 et seq., added by Stats. 1979, ch. 893, § 1, p. 3087.) Legislative history supports the conclusion that section 1430(b) was specifically enacted to create an enforcement mechanism for violations that were *not* directly related to patient health and safety. (See *Nevarrez*, *supra*, 221 Cal.App.4th at p. 135.) In 2004, the Legislature added language providing that the violation of "any other right provided for by federal or state law or regulation" may also be a basis for bringing an action. (§ 1430(b), as amended by Stats. 2004, ch. 270, § 2.) Because section 1430(b) "supplements administrative enforcement by creating a private right of action under statutes and regulations that do not themselves confer such a right," it "apparently covers a broader spectrum of violations than subdivision (a)." (*Nevarrez*, *supra*, 221 Cal.App.4th at p. 132.)

With this background in mind, we compare the language of subdivisions (a) and (b) in section 1430.

### 1. *Comparison with section 1430(a)*

As a textual matter, while sections 1430(a) and 1424 authorize the imposition of a civil penalty for "each and every" violation (§ 1424, subds. (d), (e)) and civil damages not exceeding the civil penalties that could be assessed "on account of the violation or violations" (§ 1430(a)), respectively, similar language is tellingly absent from section 1430(b). Instead, section 1430(b)'s phrase, "The licensee shall be liable for up to five hundred dollars ($500)," has no unit of measurement to which the $500 cap applies. This difference in terms between the subdivisions suggests the Legislature intended to take a different approach with respect to the $500 cap in section 1430(b). "When one part of a statute contains a term or provision, the omission of that term or provision from another part of the statute indicates the Legislature intended to convey a different meaning." (*Cornette v. Department of Transportation* (2001) 26 Cal.4th 63, 73.)

In that regard, it bears emphasis that section 1430(b) is "distinct from the administrative enforcement of the Act with which section 1424 is concerned." (*Health Facilities*, *supra*, 16 Cal.4th at p. 302.) For instance, section 1424 requires that the Department consider certain "relevant facts" to determine the amount of each civil penalty. (§ 1424, subd. (a); see *State Dept. of Public Health v. Superior Court, supra,* 60 Cal.4th at p. 951 [consideration of specific factors must be made public].) These specific facts include but are not limited to the "probability and severity" of the violation's risk to the patient's "mental and physical condition"; the patient's "medical condition"; the

patient's "mental condition" and "history of mental disability or disorder"; a facility's "good faith efforts" to prevent violation from occurring; and the facility's "history of compliance with regulations." (§ 1424, subd. (a)(1)–(5).) Likewise, in a public enforcement action brought under section 1430(a), the subject violations and amount of monetary recovery "are expressly tied to the administrative penalty scheme" under section 1424. (*Nevarrez*, *supra*, 221 Cal.App.4th at p. 131; see § 1430(a) [recoverable civil damages in private action "may not exceed the maximum amount of civil penalties that could be assessed on account of the violation or violations"].) Moreover, an administrative enforcement action offers a facility certain protections not found in an action brought against a facility under section 1430(b). (See, e.g., § 1423, subd. (b) [Department may issue only one citation for each statute or regulation violated based on a single incident "[w]here no harm to patients, residents, or guests has occurred"]; *id.*, subd. (c) [no citation issued for an " 'unusual occurrence' " if certain conditions are met].)

In contrast, despite a wide range of patient rights (see *ante*, at p. 10), section 1430(b) provides no guidance on how to determine the monetary recovery for each violation. It does *not* distinguish amongst these patient rights in terms of available remedies for any violation. Unlike class B, A, and AA violations, which increase in severity and resulting civil penalty according to the nature of the violation (see *Kizer*, *supra*, 53 Cal.3d at p. 142 [§ 1424, subds. (c), (d), (e)]), a violation of *any* of the rights covered under section 1430(b) would be subject to the same $500 cap, the recovery of attorney fees and costs, and injunctive relief. For example, the same $500 cap would apply if a nursing care facility prohibits a patient from making private telephone calls

12

(Cal. Code Regs., tit. 22, § 72527, subd. (a)(22)), or if the facility subjects the patient to physical abuse (*id*., subd. (a)(10)). While it is true that other provisions of the Long-Term Care Act require the Department to determine the number of class AA, A, and B violations a facility has committed (see dis. opn., *post*, at pp. 7–9), section 1430(b) contains no indication that the Legislature intended *juries* to exercise the same level of enforcement discretion that the Department exercises in administering the Act.

Moreover, many of the rights set out in the Patients Bill of Rights appear to overlap with one another, making it difficult to parse out what constitutes a separate and distinct violation for purposes of section 1430(b). For instance, every patient has the right "[t]o be treated with consideration, respect and full recognition of dignity and individuality" (Cal. Code Regs., tit. 22, § 72527, subd. (a)(12); "[t]o meet with others and participate in activities of social, religious and community groups" (*id*., subd. (a)(15); "[t]o have visits from members of the clergy at any time" (*id*., subd. (a)(19); and "[t]o have visits from persons of the patient's choosing at any time if the patient is critically ill" (*id*., subd. (a)(20). If a skilled nursing facility denied a resident's request to receive a visit from a pastor or priest, would this denial constitute four separate violations of the rights above, resulting in a $2000 award?

This difficulty in calculating any monetary award is further exacerbated by the circumstance that section 1430(b) "provides no notice as to what evidentiary facts constitute a single continuing violation or separate violations of a patient's right, or whether a practice or a course of conduct gives rise to one or more violations." (*Nevarrez, supra*, 221 Cal.App.4th at p. 136 [addressing due process concerns].)

13

Given the range of rights secured by section 1430(b) and the difficulty of distinguishing a series of violations from a continuing violation, it seems fairly improbable that the Legislature intended the $500 cap to be applied in a sliding-scale fashion — with damages tied to the severity of the misconduct — as the dissent suggests. (See dis. opn., *post*, at pp. 10–11) Had the Legislature intended to craft section 1430(b)'s remedial provision this way, it likely would have provided for a higher monetary cap and directed the jury to base its award on the gravity of the harm, as it has done in other contexts. (See, e.g., Civ. Code, § 1798.150, subd. (a)(2).)

These deficiencies, including the lack of textual guidance and specificity, suggest that the Legislature did not focus on calibrating any monetary relief to the nature of each patient right and violation articulated in section 1430(b). As we explain next, section 1430(b)'s legislative history further evinces the Legislature's intent that the dollar amount refers to the recovery of the entire case, not per violation. (See Stats. 1982, ch. 1455, § 1, p. 5599 [Sen. Bill No. 1930 (1981-1982 Reg. Sess.)].)

### 2. *Legislative history of section 1430(b)*

When first introduced, Senate Bill No. 1930, which added subdivision (b) to section 1430, provided that "[t]he licensee shall be liable for *up to two thousand five hundred dollars ($2,500) or three times the actual damages, whichever is greater*, and for costs and attorney fees, and may be enjoined from permitting the violation to continue." (Sen. Bill No. 1930 (1981-1982 Reg. Sess.) as introduced Mar. 17, 1982.) Later, the italicized language was amended to "*damages according to proof, punitive damages upon proof of repeated or intentional*

*violations*, and for costs and attorney fees, and may be enjoined from permitting the violation to continue." (*Id.*, as amended May 12, 1982, italics added.) A proposed revision subsequently sought to allow recovery " 'for up to $500.00 or three times the damages, whichever is greater, and for costs and attorney fees, and may be enjoined from permitting the violation to continue.' "(Felice Tanenbaum, Assistant to Sen. Nicholas Petris, Sponsor of Sen. Bill No. 1930, letter to Bruce Yarwood, Cal. Assn. of Health Facilities, July 7, 1982.) However, this revision was not adopted. Lastly, the final version of the enacted bill contains the language we see today, allowing recovery "for up to five hundred dollars ($500)." (Stats. 1982, ch. 1455, § 1, p. 5599.)

With little to no legislative material to the contrary,[4] this revision history suggests that the Legislature did not shift its intent that the dollar figure in section 1430(b) represent a per action amount. From the outset, the prescribed dollar amount, i.e., initially set at two thousand five hundred ($2,500), referred to the entire action, representing a floor for recovery if the actual damages when tripled did not add up to $2,500. (Sen. Bill No. 1930 (1981-1982 Reg. Sess.) as introduced Mar. 17, 1982.) The next revision removed the floor, and replaced it with a provision for actual damages and the possibility of punitive damages. (*Id.*,

---

[4] One minority analysis for the Assembly Committee on the Judiciary stated the following: "For each violation the patient could recover a maximum of $500 plus attorney fees at cost." (Assem. Com. on Judiciary, Minority Analysis of Sen. Bill No. 1930 (1981-1982 Reg. Sess.) as amended August 2, 1982, p. 1.) Apart from this bare sentence, there is no other legislative material supporting a per violation approach. (See *Nevarrez, supra*, 221 Cal.App.4th at p. 133 [finding minority analysis unpersuasive].)

as amended May 12, 1982.)  Though the revision was not made, a subsequent proposal sought to reinstate the recovery floor, at a lower $500 amount, as well as treble damages.  Finally, the enacted version preserved the $500 figure, but eliminated recovery of any damages. (Stats. 1982, ch. 1455, § 1, p. 5599.) Fairly read, each iteration of the remedial provision, for example, the language "damages according to proof, punitive damages upon proof of repeated or intentional violations" (Sen. Bill No. 1930 (1981-1982 Reg. Sess.) as amended May 12, 1982), was arguably crafted to encompass the entire action.

Contrary to Jarman's and the dissent's suggestion (see dis. opn., *post*, at pp. 3–4), the inclusion of the term "the violation" in the singular does not indicate that the $500 cap applied to *each* violation, particularly when we consider the general rule of statutory construction that "[t]he singular number includes the plural, and the plural the singular." (§ 13.)  More to the point, despite textual changes to the recovery of damages, every version of the bill left unchanged language that a facility "may be enjoined from permitting the violation to continue."  This suggests that the inclusion of the phrase did not reflect what the Legislature intended by the particular monetary cap.

Further, when section 1430(b) was added in 1982, section 1430(a) (formerly section 1430) provided (as it does today) that in a private action involving class A or class B violations, the amount of recoverable damages cannot "exceed the maximum amount of civil penalties" that the Department could assess long-term care facilities "on account of the violation or violations."  (Stats. 1982, ch. 1455, § 1, p. 5599.)  In 1982, the monetary amounts for these penalties specified that the penalty for class B violations, i.e., those relating to the health, safety, or security of nursing care patients, ranged from $50 to $250 for

16

"each and every violation." (§ 1424, as amended by Stats. 1982, ch. 1597, § 3, p. 6365; *Nevarrez, supra*, 221 Cal.App.4th at p. 131, fn. 12; see *Lackner v. St. Joseph Convalescent Hospital, Inc.* (1980) 106 Cal.App.3d 542, 547; see also § 1424.5, added by Stats. 2000, ch. 451, § 25, pp. 3307–3308 [alternative, increased fines for skilled nursing facilities or intermediate care facilities].)

If we consider that the recovery for each class B violation in a private action was at most $250 (§§ 1424, 1430(a)), that would mean that a less serious class C violation under section 1430(b) — i.e., one that concerned the operation or maintenance of a facility with only a "minimal relationship" to the health, safety, and security of a patient — would have been worth twice as much in terms of monetary redress as a class B violation. We decline to regard this anomalous construction as one the Legislature would have intended when it enacted section 1430(b). In that regard, the dissent's suggestion that a public enforcement action under section 1430(a) is "encumbered by procedural constraints and special protections" (dis. opn., *post*, at p. 8) makes it more peculiar that a *larger* award would be available in private suits brought under subdivision (b). (See also dis. opn., *post*, at pp. 12–13.)

Finally, the Legislature's views on the import of section 1430(b)'s $500 cap, though expressed over 20 years after the cap was added, are entitled to "due consideration." (*Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 244.) This legislative history reflects that the Legislature has consistently interpreted the provision to provide a cap of $500 per lawsuit. In 2004, the last time the Legislature amended section 1430(b), it expanded a nursing care patient's right to bring an action to include "any other right provided for by

federal or state law or regulation." (Stats. 2004, ch. 270, § 2.) In adding this admittedly broad language, the Legislature specifically affirmed that "[e]xisting law, which makes [skilled nursing facilities and intermediate care facilities] *liable for up to $500 along with litigation costs*, has been in effect since 1982." (Assem. Comm. on Health, Analysis of Assem. Bill No. 2791 (2003-2004 Reg. Sess.) as amended April 1, 2004, p. 1, italics added.) Though the declaration is neither binding nor conclusive in construing the provision, "the Legislature's expressed views on the prior import of its statutes are entitled to due consideration" even if a "gulf of decades separates" the legislative declaration and the earlier enactment. (*Western Security Bank*, at p. 244.)[5]

### D. Policy Arguments

Contrary to Jarman's suggestion, we do not find that limiting an award to $500 per lawsuit would render the statute "toothless." Section 1430(b) already provides "an abundance of reasons for licensees not to transgress its health and safety objectives," which includes "the prospect of paying the other side's attorney fees and costs and suffering an injunction with its attendant fine for contempt of court." (*Nevarrez, supra*, 221 Cal.App.4th at p. 135.) Injunctive relief would help to ensure that violations are not committed going forward, consistent with the preventative purpose of the Long-Term Care Act. (See *Kizer*,

---

[5] We observe that this 2004 legislation also proposed but did not adopt an amendment "raising the *maximum financial remedy* for rights violations from $500 to $5000." (Assem. Comm. on Health, Analysis of Assem. Bill No. 2791 (2003-2004 Reg. Sess.) as amended April 1, 2004, p. 2, italics added; see Assem. Bill No. 2791 (2003-2004 Reg. Sess.) as amended May 11, 2004.)

*supra*, 53 Cal.3d at pp. 147–148; see also Balisok, Cal. Practice Guide: Elder Abuse Litigation (The Rutter Group 2019) ¶ 10:26 ["Perhaps the most important remedy specified in § 1430(b) is injunctive relief"].) Even if a plaintiff's recovery is limited to injunctive relief or includes little to no monetary relief, the potential for attorney fees and costs could still serve as a strong deterrent. (See *Nevarrez, supra*, 221 Cal.App.4th at p. 135; see *City of Riverside v. Rivera* (1986) 477 U.S. 561, 574 [in civil rights action, fee award need not be proportionate to damages amount when vindication of rights "cannot be valued solely in monetary terms"].)

Nor do we find it absurd that section 1430(b) does not authorize a nursing care resident to obtain up to $500 for each violation a facility commits. Section 1430 itself declares that "[t]he remedies specified in this section shall be *in addition to* any other remedy provided by law." (§ 1430, subd. (c), italics added.) It "does not foreclose civil actions for damages by patients who have been injured by a violation." (*Kizer, supra*, 53 Cal.3d at p. 143; see *id.* at p. 150 [private action under § 1430(b) is one of several "alternative enforcement mechanisms" of Long-Term Care Act]; see § 1430(a).) Put another way, we conclude section 1430(b) was *not* intended to be the exclusive or primary enforcement mechanism for residents of long-term care facilities seeking compensation for harms suffered in those facilities. (See *Lemaire v. Covenant Care California, LLC* (2015) 234 Cal.App.4th 860, 867 [§ 1430(b) "is not a substitute for the standard damage causes of action for injuries suffered by residents of nursing care facilities"].) Tort law has long provided remedies for individuals seeking compensation for harm. And consistent with the objective to provide comprehensive measures to protect nursing care

patients who are often elderly, the Legislature has designed additional protections that take various forms. (See *Kizer*, *supra*, 53 Cal.3d at p. 150; *Health Facilities*, *supra*, 16 Cal.4th at p. 305.)

For example, the Elder Abuse Act is specifically designed to identify and address — through the imposition of enhanced sanctions — the seriousness and frequency of neglect or abuse committed against elderly individuals. (See *Delaney*, *supra*, 20 Cal.4th at p. 32 [Welf. & Inst. Code, § 15657 covers "forms of abuse or neglect performed with some state of culpability greater than mere negligence"]; *Winn v. Pioneer Medical Group, Inc.* (2016) 63 Cal.4th 148, 160 [Welf. & Inst. Code, § 15657 "explicitly limited to physical abuse and neglect"].) In this case, Jarman's allegations of neglect (e.g., Manor Care's "conduct was reckless and outrageous" because its staff "acted in conscious disregard of Mr. Jarman knowing that harm was eminent if it didn't change its conduct") are typical of those that help form the basis of an action under the Elder Abuse Act. (See *Carter v. Prime Healthcare Paradise Valley LLC* (2011) 198 Cal.App.4th 396, 405–406 [compiling cases].) We do not opine on the validity or likelihood of success of Jarman's claim under the Elder Abuse Act, however. We merely note that unlike the Elder Abuse Act or, for that matter, traditional tort law causes of action like negligence that are available to nursing care patients, section 1430(b)'s $500 cap does not appear to take into account the severity of a facility's misconduct, nor does it appear designed to provide plaintiffs full compensation for harms suffered in those facilities.

As this case amply demonstrates, a per violation approach under section 1430(b) would present substantial practical difficulties. The special verdict form here asked the jury, "How

many times did Manor Care of Hemet violate any rights of Jarman provided for by federal or state law or regulation?" and "What is the total amount you find HCR MANOR CARE liable for as a result of violating John Jarman's rights?" The form added that "[t]he amount awarded per right violation cannot exceed $500 *for each right violation occurrence*." (Italics added.)

The record reflects that the jury decidedly struggled with how to calculate the number of violations Manor Care committed. Ultimately, the jury answered "382" to the question "[h]ow many times" Manor Care violated any of John Jarman's rights. As to the facility's monetary liability, the jury concluded every violation was worth $250 each, thus totaling $95,500. Critically, there was no enumeration of which specific right (or how many times each right) was violated.[6]

In concluding that section 1430(b) authorizes a $500 per lawsuit cap, we see little risk of plaintiffs maneuvering around this cap by filing multiple lawsuits. To the extent that industrious counsel may craft pleadings to divide one case into multiple cases for the sole purpose of recovering multiple $500

---

[6]    The dissent, too, does not resolve what counts as a violation. (See dis. opn., *post*, at pp. 23–24.) This not only underscores the difficulty of defining a "violation," it also undermines the dissent's claim that interpreting the $500 cap to apply per action "will radically reduce the financial incentive for compliance under section 1430(b) of the Act." (Dis. opn., *post*, at p. 13.) After all, if innumerable violations of the same right count as only one violation (see *id.*, at pp. 21–22), then even on the dissent's view, the award authorized by section 1430(b) is not "tied to the number and severity of violations" (dis. opn., *post*, at p. 14).

awards, principles of claim and issue preclusion could limit such attempts at manipulation. (See *DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 824–825.) Moreover, trial courts would likely consider "inefficient or duplicative efforts" when evaluating attorney fee requests. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132.)

## CONCLUSION

Undoubtedly, nursing care patients comprise a particularly vulnerable segment of our population and deserve the highest protections against any abuse and substandard care.[7] That said, we cannot and must not legislate by grafting onto section 1430(b) a remedy that the Legislature has chosen not to include. (See *Cornette v. Department of Transportation, supra,* 26 Cal.4th at pp. 73–74 [courts "may not rewrite a statute, either by inserting or omitting language, to make it conform to a presumed intent that is not expressed"].) Instead, we look to the Legislature, which has left the phrase (i.e., a facility "shall be liable for up to five hundred dollars ($500)") unchanged for nearly 40 years, to make any necessary adjustments or clarifications as it sees fit.

---

[7] As the dissent recounts (see dis. opn., *post,* at pp. 1–2), a global pandemic has gripped this state, causing immeasurable suffering and death. And we have no reason to doubt that the COVID-19 disease has disproportionately afflicted our state's nursing care facilities. That said, this unprecedented situation does not bear on the question presented in this case, i.e., what did the Legislature intend since 1982 when it limited a facility's monetary liability under section 1430(b) to $500, particularly given the availability of other remedies. (See *ante,* at pp. 19–20.)

We reverse the Court of Appeal's judgment,[8] and remand for further proceedings consistent with this opinion.

**CHIN, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**KRUGER, J.**
**GROBAN, J.**

---

[8]     We do not reach the question whether Jarman is entitled to punitive damages.  Moreover, because the issue is not implicated here, we do not address how the $500 cap in section 1430(b) would apply to lawsuits involving multiple plaintiff patients.

JARMAN v. HCR MANORCARE, INC.

S241431

Dissenting Opinion by Justice Cuéllar

A global pandemic is afflicting California, burdening millions and killing thousands from Imperial County to the Oregon border. Nowhere has the pain of the COVID-19 virus been more acutely felt than in our state's nursing homes. (See, e.g., Sciacca, The Mercury News (July 1, 2020) *Hayward nursing home's large COVID-19 outbreak preceded by long history of neglect and abuse, lawsuit claims* <https://www.mercurynews.com/2020/07/01/hayward-nursing-homes-large-covid-19-outbreak-preceded-by-long-history-of-neglect-and-abuse-lawsuit-claims/> [as of Aug. 13, 2020]; Ravani, S.F. Chronicle (July 3, 2020) *Contra Costa DA alleges elder abuse, sexual assault at troubled Orinda nursing home* <https://www.sfchronicle.com/bayarea/article/Contra-Costa-DA-alleges-elder-abuse-sexual-15383492.php> [as of Aug. 13, 2020] ["The Contra Costa County district attorney's office has found evidence of elder abuse, including a suspected sexual assault, at a 47-bed Orinda nursing home where nearly every resident and many workers became infected with the coronavirus in April"]; Wiener, CalMatters (June 15, 2020) *Who's watching now? COVID-19 cases swell in nursing homes with poor track records* <https://calmatters.org/health/coronavirus/2020/06/nursing-homes-coronavirus-deaths-infections-inspections-violations-kingston-california/> [as of Aug. 13, 2020] [profiling a number of California nursing homes, including one that has been labeled a "special focus facility," which designates

facilities that may face forcible closure, for a year and a half and has now recorded 112 cases of COVID-19 among residents and 18 deaths]; see also, Cenziper et al., The Washington Post (Aug. 4, 2020) *Nursing home companies accused of misusing federal money received hundreds of millions of dollars in pandemic relief* <https://www.washingtonpost.com/business/2020/08/04/nursing -home-companies-accused-misusing-federal-money-received- hundreds-millions-dollars-pandemic-relief/> [as of Aug. 13, 2020].) The defendant in this case is no exception: At one of the facilities run by defendant in Walnut Creek, California, 130 people are infected, and 12 have died. (Bauman, S.F. Chronicle (July 20, 2020) *Coronavirus: Outbreak at Walnut Creek nursing home leaves 12 dead, 130 infected* <https://www.sfchronicle.com/bayarea/article/Coronavirus- Outbreak-at-Walnut-Creak-nursing-15421482.php> [as of Aug. 13, 2020].[1])

At the heart of this case is the Long-Term Care, Health, Safety, and Security Act of 1973 (Health & Saf. Code, § 1417 et seq.; hereafter Long-Term Care Act)[2], a law enacted to help protect vulnerable residents in nursing homes. It enshrines rights such as freedom from mental and physical abuse, freedom from psychotherapeutic drugs and physical restraints used for patient discipline or staff convenience, the right "[t]o be fully informed by a physician of his or her total health status," and the right to participate in the planning of medical treatment and

---

[1]    All Internet citations in this opinion are archived by year, docket number, and case name at <http://www.courts.ca.gov/ 38324.htm>.

[2]    All statutory references are to the Health and Safety Code unless otherwise noted.

to refuse experimental treatment. (Cal. Code Regs., tit. 22, § 72527.) Also included in the Long-Term Care Act is a remedy: "A current or former resident or patient of a skilled nursing facility . . . may bring a civil action against the licensee of a facility who violates any rights of the resident or patient as set forth in the Patients Bill of Rights in Section 72527 of Title 22 of the California Code of Regulations, or any other right provided for by federal or state law or regulation. . . . The licensee shall be liable for up to five hundred dollars ($500), and for costs and attorney fees, and may be enjoined from permitting the violation to continue." (Health & Saf. Code, § 1430, subd. (b) (section 1430(b).) That no right is meaningful without a remedy makes the language of section 1430(b) especially important, even if — as the majority agrees — it's initially unclear whether the reference to a "violation," when read in isolation, limits a plaintiff's recovery to just $500 per lawsuit. What belies that reading is the language, statutory structure, and history of this provision. The provision's purpose was to deter violations of the "Patients Bill of Rights" and other provisions of the Long-Term Care Act, and it effectuated that purpose by allowing patients to seek compensation of up to $500 for each violation. Because the majority's reading deprives nursing home residents of an important tool to deter and vindicate violations of their rights, and otherwise fails to persuade, I dissent with respect.

## I.

Where section 1430(b) limits liability to $500, it does so by referring to "the violation" in the singular. ("The licensee shall be liable for up to five hundred dollars ($500), and for costs and attorney fees, and may be enjoined from permitting the violation to continue.") When aggrieved plaintiffs endure conditions troubling enough to provoke a lawsuit seeking vindication of

their rights under the Long-Term Care Act, they have reason to cite more than one instance of known misconduct — making it wildly improbable that most or even many lawsuits would ever mention just a single instance of misconduct. So long as we live in a world where patients rarely find only one of their rights has been violated, single-violation lawsuits will be the exception. The reference to a singular violation in the key sentence of the statute therefore strongly implies that the $500 cap applies to a single violation, not a civil action.

The majority points to the fact that other sections of the act more explicitly reference multiple violations. Sections 1430, subdivision (a) (section 1430(a)), and 1424 authorize the imposition of a civil penalty for "each and every" violation (§ 1424, subds. (d), (e)) and "on account of the violation or violations" (§ 1430(a)). (Maj. opn., *ante*, at p. 11.) They note that "similar language is tellingly absent from section 1430(b)." (*Ibid*.) This distinction is hardly dispositive, because it's not the only difference between these provisions. Sections 1424 and 1430(a) concern an administrative civil penalty scheme, while section 1430(b) creates a private right of action. Further, the penalty scheme established by section 1424 did not exist for the Patients Bill of Rights at the time section 1430(b) was enacted. Because there was no administrative analog for subdivision (b), this distinction in language seems less significant. Perhaps more importantly, the text taken together with the structure and legislative history of section 1430(b) evinces a legislative purpose to protect the rights of nursing home residents. We should be wary of an interpretation that strays so far from that purpose, especially in light of the ambiguity of this text.

We can readily glean further support for this conclusion from the legislative history. The *only* explanation of the

application of the $500 limit to be found in the history of the bill provides that "*[f]or each violation* the patient could recover a maximum of $500 plus attorneys fees at cost. The patient could also obtain an injunction against future violations." (Assem. Com. on Judiciary, Minority Analysis of Sen. Bill No. 1930 (1981-1982 Reg. Sess.) as amended Aug. 2, 1982, p. 1, italics added.) While a minority committee report is undoubtedly not dispositive, it was produced and available to lawmakers contemporaneously with the debate and eventual legislative passage of Senate Bill No. 1930 (1981-1982 Reg. Sess.) (Senate Bill 1930). It's the clearest statement on the question we are asked to answer, and nothing in the legislative history directly refutes it.

Ignoring this, the majority relies on a committee report from legislation enacted more than 20 years later. (Maj. opn., *ante*, at pp. 17–18.) While we should consider this evidence, "there is little logic and some incongruity in the notion that one Legislature may speak authoritatively on the intent of an earlier Legislature's enactment when a gulf of decades separates the two bodies." (*Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 244 (*Western Security Bank*).) It seems especially incongruous to rely on the history of subsequently-enacted legislation here, where the enacting Legislature provided a clear statement on the meaning of the disputed language.

It's likewise unpersuasive for the majority to seek mileage from the fact that the Legislature hasn't revised the cap. (See maj. opn., *ante*, at p. 22.) Sure: the Legislature's decision to leave a law unchanged occasionally illuminates our reading of statutes by helping us understand how another branch may have construed a statute. But not even the Legislature that enacted a statute — and even less, a different legislative

majority years or decades later — gets to sidestep the courts by having the final say on what a statute means. (See *Western Security Bank*, *supra*, 15 Cal.4th at p. 244 ["[A] legislative declaration of an existing statute's meaning is neither binding nor conclusive in construing the statute. Ultimately, the interpretation of a statute is an exercise of the judicial power the Constitution assigns to the courts"].) What's more, that the Legislature left section 1430(b) intact for decades no more confirms that it embraced a per lawsuit cap than it supports the opposite conclusion. Either way, subsequent legislative majorities left ambiguous language intact, and what limited inferences we can reasonably glean from that for purposes of our interpretation do little to support the majority's reading.

When legislators explained why they introduced or otherwise supported the enactment of section 1430(b), their explanations also fit a per-violation cap. The explicit purpose of Senate Bill 1930 was to "protect and ensure the rights of people residing in nursing homes." (Sen. Com. on Judiciary, Rep. on Sen. Bill No. 1930 (1981-1982 Reg. Sess.) as amended Apr. 26, 1982, p. 2 (hereafter Judiciary Committee Report).) Numerous sources suggest the Legislature was concerned that violations were underenforced in the preexisting legal regime. The bill's sponsor declared it "tragic" that "basic rights such as privacy in medical treatment, freedom from mental and physical abuse, accessibility to visitors, [and] ability to make confidential phone calls" were violated without recourse. (Senator Nicholas Petris, Opening Statement on Sen. Bill No. 1930 (1981-1982 Reg. Sess.) as introduced Mar. 16, 1982; accord, Judiciary Com. Rep., *supra*, at p. 2 ["Existing law authori[zing] the Attorney General . . . to bring an action against a licensee" is "not sufficient to ensure a patient her rights," according to the bill's author].)

6

This history underscores why the purpose of the bill is most sensibly understood to be primarily the protection of nursing home residents' rights with the goal of deterring violations of those rights and providing recourse where violations occur. A per violation cap is thoroughly in line with this purpose. Contrastingly, under a per lawsuit cap, the additional pressure to stop violating rights that a facility faces from statutory penalties once it has violated one right is effectively zero. A facility will face the same potential liability whether it violates one right or one hundred. A cap of $500 per lawsuit is clearly "not sufficient to ensure a patient her rights." (Judiciary Com. Rep., *supra*, at p. 2.)

Reviewing the legislative history, the majority notes that the maximum recovery for a class B violation (which now ranges from $100 to $1,000) was only $250 at the time of Senate Bill 1930's passage. The majority contends that it would be "anomalous" for the Legislature to simultaneously authorize a maximum recovery of $500 for violations under section 1430(b). (Maj. opn., *ante*, at p. 17.) When Senate Bill 1930 was enacted, section 1430(b) did not allow patients to sue for "any other right provided for by federal or state law or regulation," (§ 1430(b)), rather, suits were limited to violations of the Patients Bill of Rights. (Stats. 1982, ch. 1455, § 1, p. 5599.) The majority concludes that under a per violation theory, "a less serious class C violation under section 1430(b) — i.e., one that concerned the operation or maintenance of a facility with only a 'minimal relationship' to the health, safety, and security of a patient — would have been worth twice as much in terms of monetary redress as a class B violation." (Maj. opn., *ante*, at p. 17.)

But suits invoking section 1430(a) and those relying on section 1430(b) are not equivalent enforcement mechanisms.

Section 1430(a) empowers the Attorney General to bring suit, creating a public enforcement scheme. Section 1430(b), on the other hand, establishes a private right of action and thus a private enforcement scheme. Portraying the private right of action created by section 1430(b) and the power given to the Attorney General to sue under section 1430(a) as equivalent, the majority does not address the important differences between public and private enforcement schemes. Public enforcement tends to be encumbered by procedural constraints and special protections. So it is, here: For example, at the time of section 1430(b)'s enactment, the Attorney General's ability to seek any civil penalties for a class B violation was limited: if a class "B" violation was corrected within a specified time, "no civil penalties shall be imposed." (Stats. 1982, ch. 1597, § 3, p. 6365, amending § 1424, subd. (b).) Today's version of section 1430(a) still includes the limitation that the Attorney General may bring suit for class A and B violations, "*[e]xcept* where the state department has taken action and the violations have been corrected to its satisfaction." (Italics added.) The "state department" is further required to make a special finding that the violation has a "direct or immediate relationship to the health, safety, or security of long-term health care facility patients" in order to pursue a class B violation (§ 1424, subd. (e); Stats. 1982, ch. 1597, § 3, p. 6365), and an even more stringent finding that "imminent danger that death or serious harm to the patients" or "substantial probability that death or serious physical harm to patients" in order to sue for a class A violation (§ 1424, subd. (d); Stats. 1982, ch. 1597, § 3, p. 6365). The need for procedural protections in the public scheme is unsurprising given the range of consequences that attach to Class AA, A, or B violations above and beyond the monetary penalty. Facilities

with Class AA, A, or B violations are subject to increased state inspections (§ 1422, subd. (b)(1)(A)) and must publish citations in a consumer information system (§ 1422.5, subd. (a)(4)).

None of those restrictions or triggers for reputational consequences is in section 1430(b), nor were they present when it was enacted. Any qualifying nursing home patient may bring a claim. When section 1430(b) was first enacted, those claims were indeed limited to violations of rights in the Patients Bill of Rights. (Stats. 1982, ch. 1455, § 1, p. 5599.) But many such rights — made actionable by section 1430(b), though labeled "class C" — are as serious as any for a nursing home resident: they include the right to be free from mental and physical abuse, to participate in the planning of medical treatment and to refuse experimental treatment, and to be transferred or discharged only for medical reasons or for nonpayment only with reasonable notice. (Cal. Code Regs., tit. 22, § 72527.) What's more, there's overlap between these and both class B and C violations because of how the statutory scheme works. At the time Senate Bill 1930 was enacted, class B rights were those "which the state department determines have a direct or immediate relationship to the health, safety, or security of long-term health care facility patients. . . ." (Stats. 1982, ch. 1597, § 3, p. 6365, amending § 1424.) Today, class B violations expressly include the Patients Bill of Rights. (§ 1424, subd. (e) ["Unless otherwise determined by the state department to be a class 'A' violation . . . , any violation of a patient's rights as set forth in Section[] 72527 [Patients Bill of Rights] . . . of Title 22 of the California Code of Regulations, that is determined by the state department to cause or under circumstances likely to cause significant humiliation, indignity, anxiety, or other emotional trauma to a patient is a class 'B' violation"].) What makes the class B

violations more "serious" isn't something inherent about the kind of violation, but an additional finding by the agency — a finding that's simply not required for a private suit. Class A violations work much the same way. The violations included in section 1430(b) at the time of its passage are class C not because they are inherently any less serious or because they couldn't have a "direct and immediate relationship to [] health" (§ 1424, subd. (e)), but because no such finding is necessary for a private suit under section 1430(b).

The majority reasons that suits under section 1430(b) must be worth less than those under section 1430(a) because they don't require a finding that the violation is closely related to the health and safety of nursing home residents. Not so, because subdivisions (a) and (b) don't necessarily reflect more or less serious offenses. Instead, they create entirely distinct enforcement schemes: one public and one private. With this understanding, this structure — which includes not only the caps for class B and class A offenses, but also requires certain findings before those violations can be enforced, and previously included a restriction on the imposition of civil penalties for class B offenses — reflects the fact that the legislative process evinces the special concern about what happens when the government exercises its formidable power against a particular facility.

Legislators who supported the Long-Term Care Act, of course, may have sought to place some limitation on private lawsuits to protect against fears of open-ended liability. A cap of $500 per violation is well suited to this purpose, and may reflect a judgment that this limit is high enough to protect patient rights and provide recourse when rights are violated, but low enough to create some limitation on liability. By

creating a cap with no floor, the Legislature might reasonably have been relying on juries to right-size damages to account for how serious or minor a specific violation was.

It's possible that a $500 per violation cap might have created some counterintuitive results when class B violations were limited to $250. A private suit for minor violations could have yielded higher civil penalties than a public enforcement suit for more serious offenses. But the possibility of such a suit would depend on several assumptions: (1) the private suit doesn't implicate class A or B violations and only concerns "milder" deficiencies, and (2) the per violation punishment imposed is greater than $250 for all these mild deficiencies. It would also ignore any differences in the reputational impact of vigorous public enforcement relative to private enforcement. The majority's concern seems to boil down to a fear that patients will be irresponsible in bringing suits, opening up nursing homes to expansive liability for minor violations. Yet that possibility arises whenever the Legislature creates a private right of action for damages. Addressing this potential problem is a policy choice better left to the Legislature.

A $500 per lawsuit cap will also place additional weight on encumbered, resource-constrained public enforcement. This concern motivated the passage of Senate Bill 1930; the bill's author explained that "since the State is making major cuts in services to people, it is more important than ever to allow the institutionalized individual the ability to protect their own constitutional rights in the private sector." (Judiciary Com. Rep., *supra*, at p. 2.) Today, budget shortfalls as a result of the COVID-19 pandemic likewise threaten the efficacy of public-only enforcement models. (See, e.g. Associated Press (June 29, 2020) *California's budget has billions in cuts to close deficit*

<https://apnews.com/567bdaba2f74076b1fdcd603f18757ec> [as of Aug. 13, 2020].) The majority's decision today will significantly hamper private efforts to fill what will no doubt be a void created by the reduced public enforcement resources.

## II.

A primary purpose of section 1430(b) is to protect patient rights and deter violations. We have long recognized that the threat of monetary penalties or damages can deter and prevent wrongdoing. (See, e.g., *In re Pedro T.* (1994) 8 Cal.4th 1041, 1052 ["The purpose of the temporary increase in penalties under the former law was to punish more severely, and thereby deter, vehicle thefts"]; *Peterson v. Superior Court* (1982) 31 Cal.3d 147, 161 ["the award of punitive damages is a type of penalty imposed to deter wrongful conduct"]; *Williams v. Superior Court* (2017) 3 Cal.5th 531, 545 ["The Legislature addressed these difficulties by adopting a schedule of civil penalties ' "significant enough to deter violations" ' for those provisions that lacked existing noncriminal sanctions"].) That increased penalties can advance the cause of preventing offenses is an insight not only commonplace in our own decisions, but in legislative discussions and the relevant scholarly literature. (See, e.g., Lemley & Reese, *Reducing Digital Copyright Infringement Without Restricting Innovation* (2004) 56 Stan. L.Rev. 1345, 1418 ["Monetary penalties should be sufficiently large that the possibility of having uploading challenged in the administrative procedure serves to deter others from engaging in large-scale uploading"]; Spence, *The Shadow of the Rational Polluter: Rethinking the Role of Rational Actor Models in Environmental Law* (2001) 89 Calif. L.Rev. 917, 918 [explaining the "traditional view" that "environmental enforcement must aim to deter violations through the imposition of penalties"]; Bus. & Prof.

Code, § 5116, subd. (c) ["The board shall adopt regulations to establish criteria for assessing administrative penalties based upon factors, including . . . the level of administrative penalty necessary to deter future violations of this chapter"]; Stats. 2000, ch. 102, § 1, pp. 1150–1151 ["The people enact the Campaign Contribution and Voluntary Expenditure Limits Without Taxpayer Financing Amendments to the Political Reform Act of 1974 to accomplish all of the following purposes[:] . . . [t]o enact increased penalties to deter persons from violating the Political Reform Act of 1974"].) The potential for a lawsuit worth as much as $500 per violation is a powerful incentive to adhere to the requirements of the Long-Term Care Act. The majority's reading severely blunts that incentive, by starkly reducing the financial rationale for compliance under section 1430(b) of the act.

The majority insists that its reading does not render the statute " 'toothless.' " (Maj. opn., *ante*, at p. 18.) " '[T]he prospect of paying the other side's attorney fees and costs and suffering an injunction' " are adequate to meet the purposes of the statute, in the majority's view. (*Ibid.*, quoting *Nevarrez v. San Marino Skilled Nursing & Wellness Centre, LCC* (2013) 221 Cal.App.4th 102, 135.) It makes little difference that the majority leaves a few teeth awkwardly hanging in the mouth after pulling most of them out, as availability of injunctive relief and attorney fees are plainly insufficient to fulfill the statute's purpose to deter and remedy violations of nursing home patients' rights. A trial court decides on "the amount of reasonable attorney fees by considering factors such as ' "the nature of the litigation, its difficulty, *the amount involved*, the skill required in its handling, the skill employed, the attention given, the success or failure, and other circumstances in the

case." ' " (*Nevarrez*, at p. 129, italics added.)  Indeed, *Nevarrez* reversed a fee award under section 1430(b), reasoning that "[w]hether that result includes an award of $7,000 or $500 will be relevant on remand." (*Nevarrez*, at p. 129.)  Moreover, a $500 per lawsuit cap will encourage rational defendants to settle lawsuits quickly because of the low potential liability they will face by admitting wrongdoing.  Facilities are thus likely to be liable for only the nominal attorney fees accumulated during short settlement negotiations.  Attorney fees do not reliably or predictably increase in response to additional or more serious violations, making them an odd proxy of liability for wrongdoing.

Injunctive relief likewise offers only limited protections and benefits.  While such relief is important for those who must stay in the nursing facility, it is unavailable for residents who change facilities or who pass away during the pendency of the suit.  The deterrent effect of section 1430(b) will now depend on the position of the resident, not the culpability of the facility.  More foundationally, injunctions merely require the facility to act in accordance with its preexisting legal obligations, blunting their ability to serve as a deterrent to wrongdoing in the first instance.  "The injunction is little more than a cease and desist order.  The guilty party keeps his gains and is merely ordered not to defraud people in the same way again." (*People v. Superior Court (Jayhill)* (1973) 9 Cal.3d 283, 289, fn. 3.) Staffing — of particular relevance in this case — is a substantial operational cost for many of these facilities.  A facility could reasonably conclude that the benefits of understaffing outweigh the remote risk of an injunction.

Statutory penalties tied to the number and severity of violations would fill this mismatch of incentives.  Given the

purpose of this statute to allow vulnerable nursing home residents to better protect their own rights, the natural conclusion is that the Legislature intended the $500 penalty to serve as an additional deterrent to wrongdoing. The Legislature has similarly added statutory penalties to other enforcement schemes like the false advertising law and unfair competition law where it finds that "the injunctive remedy was . . . an ineffective deterrent against violations." (See *People v. Superior Court* (*Olson*) (1979) 96 Cal.App.3d 181, 191, citing *Review of Selected 1972 California Legislation*, 4 Pacific L.J. 335, 342.) There is simply no reason to believe the Legislature did not intend the same in creating the $500 penalty for a violation under the act enforced through section 1430(b).

The majority suggests this reading is "improbable" because even a $500 per violation limit is too low to provide fully compensatory damages. (Maj. opn., *ante*, at p. 14.) But, in an attempt to have their cake and eat it too, they later contend that the Legislature's decision not to raise the cap from $500 to $5,000 in 2004 is evidence that the cap applies on a per lawsuit basis. (*Id*. at p. 18, fn. 5.) In doing so, they demand that a per violation be at a precisely-calibrated level — one that doesn't even get defined by the majority — that's not too low nor too high, but just right. But there is no Goldilocks rule of statutory interpretation, and we have no sensible justification for casting aside the Legislature's enforcement scheme because they didn't pick precisely the penalty amount that would have made this case easier for us to resolve.

Justifying the drastic limitations on damages available for claims under the Long-Term Care Act in their interpretation, the majority also emphasizes that section 1430(b) remedies are " '*in addition to* any other remedy provided by law.' " (Maj. opn.,

*ante*, at p. 19, quoting § 1430, subd. (c).)  This reasoning is a substantial departure from our prior precedent.  Discussing the Long-Term Care Act previously, we have declined to narrowly construe its protections simply because other remedies remain available.  In *Kizer v. County of San Mateo* (1991) 53 Cal.3d 139, we reasoned that "alternative enforcement mechanisms [like the threat of a personal injury lawsuit] do not vitiate the need for the statutory penalties." (*Id.* at p. 150.)  Later, in *California Association of Health Facilities v. Department of Health Services* (1997) 16 Cal.4th 284, we declined to find that the Elder Abuse and Dependent Adult Civil Protection Act (Welf. & Inst. Code, § 15600 et seq.; hereafter Elder Abuse Act) marked a shift in legislative enforcement priorities:  "The addition of a new statutory private right of action for elder abuse since our opinion in *Kizer* does not change our view that the primary responsibility for enforcing compliance with statutes and regulations governing long-term health care facilities has been given to the Department through its licensing, inspection, and citation regime." (*California Assn.*, at p. 305.)

Nor does the Elder Abuse Act and the Long-Term Care Act duplicate the protection this law — properly interpreted — provides.  The Elder Abuse Act allows for recovery only where a plaintiff can prove "by clear and convincing evidence that a defendant is liable for physical abuse . . . , neglect . . . , or abandonment" and also is guilty of "recklessness, oppression, fraud, or malice in the commission of this abuse." (Welf. & Inst. Code, § 15657.)  This not an insubstantial burden.  Damages, however, can also be sizable:  That act allows for the recovery of damages up to $250,000. (Welf. & Inst. Code, § 15657; Civ. Code, § 3333.2, subd. (b).)   Section 1430(b) of the Long-Term Care Act authorizes a much broader range of lawsuits:  Patients

16

may bring claims against any care provider who "violates any rights of the resident or patient as set forth in the Patients Bill of Rights in Section 72527 of Title 22 of the California Code of Regulations, or any other right provided for by federal or state law or regulation." (§ 1430(b).) Section 1430(b) does not require a plaintiff to prove that a defendant nursing home was also guilty of recklessness, oppression, fraud, or malice. In line with the lower required showing of proof, the Legislature provided for lower maximum damages: only up to $500 per violation. The majority's interpretation eliminates the availability of any meaningful damages remedy for acts not covered by the Elder Abuse Act, and for cases where a plaintiff is unable to prove recklessness, oppression, fraud, or malice.

Legislators, too, considered preexisting remedies as inadequate to protect patient rights. The Senate Judiciary Committee summary of the bill explained that according to the bill's author, existing law "is not sufficient to ensure a patient her rights." (Judiciary Com. Rep., *supra,* at p. 2.) The bill's sponsor declared it "tragic" that "basic rights such as privacy in medical treatment, freedom from mental and physical abuse, accessibility to visitors, [and] ability to make confidential phone calls" were violated without recourse. (Senator Nicholas Petris, Opening Statement on Sen. Bill No. 1930 (1981-1982 Reg. Sess.) as introduced Mar. 16, 1982.)

The Legislature likewise rejected an argument by the California Association of Health Facilities (CAHF), an amicus curiae in this case, that the legislation was unnecessary because existing legal remedies were sufficient. In explaining their opposition to the bill, CAHF contended that "[u]nder existing tort law, any guardian of any patient may bring suit against any facility or its employees for harm caused to that patient as a

result of the actions of the facility or its employees." (CAHF, Statement in Opposition to Sen. Bill 1930, May 4, 1982.) These arguments did not carry the day when Senate Bill 1930 passed, and it is odd to rely on them now to restrict recovery under section 1430(b).

The majority's reliance on a patient's ability to obtain an injunction and attorney fees under section 1430(b), as well as their contention that other available legal remedies can provide for adequately compensatory damages remedies, prompt the more fundamental question: If all of that is true, what possible purpose does damages of up to $500 per lawsuit serve? If the $500 is a penalty, then a $500 per-lawsuit penalty is clearly insufficient to serve the statute's goal of deterring regulatory violations. If the $500 is considered compensatory, a per-lawsuit approach does not compensate residents for the violations of many rights covered by section 1430(b). We should be extremely wary of statutory constructions that render a word or phrase useless. That is, in practical terms, exactly what the majority's construction of the $500 limitation achieves here.

## III.

Crucial to the majority's analysis is its apparent disquiet that "a per violation approach under section 1430(b) would present substantial practical difficulties." (Maj. opn., *ante*, at p. 20.) But there's a difference between recognizing that some lines may need to be drawn to avoid having the wording of a complaint be the sole determinant of what counts as a violation and concluding that a sensible reading of the statute would prove unworkable. The fact that the jury here found 382 violations — without ever being asked to specify what those

violations were — no doubt increases the discomfort with the notion of allowing for recovery on a per-violation basis.

We should not, however, allow bad facts to drive the creation of bad law. The record demonstrates that the jurors in this case were given little guidance on how to define a violation. The special verdict form contained no enumeration of the specific patient's rights at issue in the case. Jarman's closing arguments did not reference specific patients' rights. Some specific rights were alleged in the pleadings, such as the right to sufficient staffing (42 C.F.R. § 483.30), the right to remain free from physical and mental abuse (Cal. Code Regs., tit. 22, § 72527, subd. (a)(10)), and the right to be treated with respect and dignity in care of personal needs (*id.*, subd. (a)(12)). But aside from an expert witness discussing the Patients Bill of Rights, it does not appear that particular violations were argued to the jury, which gave it no benchmark to assess the number. The jury submitted a note that indicated confusion about how to calculate violations, and received little in the way of clarification from the trial court.

Surely the solution to this problem — convenient though it may be to the courts — is not to all but functionally eliminate monetary penalties available to plaintiffs under the Long-Term Care Act. A verdict form requiring the jury to specify which violations it finds the defendant committed would go a long way toward solving this problem. Requiring that juries make findings that are sufficiently detailed to discern the basis for a total award would eliminate the potential for factually unsupported monetary awards based on some of the more amorphous enumerated patients' rights.

Requiring juries to decide which violations defendant has committed indeed opens the door to a more important concern: how to define a violation under the act. The Patients Bill of Rights defines rights that can overlap, such as the rights "[t]o be treated with consideration, respect and full recognition of dignity and individuality," "[t]o meet with others and participate in activities of social, religious and community groups," and "[t]o have visits from members of the clergy at any time." (Cal. Code Regs., tit. 22, § 72527, subds. (a)(12), (15) & (19).) If a facility denied a resident's request to have a visit from her priest, would that one incident constitute three separate violations of the above rights? And if a facility does not have regular visitor hours established, has it violated the right to have "daily visiting hours established" (*id.*, subd. (a)(18)) every day it fails to do so, or is that just one violation?

The majority's approach avoids this problem for section 1430(b) suits — but only by creating another: eliminating a meaningful damages remedy and undermining the statute's purpose to provide protection and recourse for nursing home patients whose rights are violated. While the statute's ambiguity creates a thorny problem, we are not without tools to solve it. We have addressed similar challenges in the context of California's landmark consumer protection law, the unfair competition law. (Bus. & Prof. Code, § 17200 et seq.) Reading that statute, it would likewise seem that a violation occurs every time a misrepresentation is disseminated. (Bus. & Prof. Code, § 17200 ["[U]nfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by" the false advertising law].) Yet in *Jayhill, supra,* 9 Cal.3d 283, this court defined a violation differently:

"We determine what constitutes a 'violation' as that term is used in [the Business and Professional Code] section 17536. The Attorney General contends that each misrepresentation by a defendant constitutes a separate violation subject to a $2,500 civil penalty. As the number of misrepresentations allegedly committed by defendant Jayhill alone is no less than 25, under the Attorney General's theory Jayhill would be liable for a $62,500 penalty for each customer solicited if the allegations were proved. While the intent of section 17536 was to strengthen the hand of the Attorney General in seeking redress for violations of section 17500, it is unreasonable to assume that the Legislature intended to impose a penalty of this magnitude for the solicitation of one potential customer. Rather, we believe the Legislature intended that the number of violations is to be determined by the number of persons to whom the misrepresentations were made, and not by the number of separately identifiable misrepresentations involved. Thus, regardless of how many misrepresentations were allegedly made to any one potential customer, the penalty may not exceed $2,500 for each customer solicited by a defendant."

(*Id.* at pp. 288–289, fn. omitted.) Why not employ similar reasoning here to hold that, for example, failing to have regular visitors' hours established results in the violation of a single right, even where the failure continues over multiple days or weeks? Or to find that the Legislature intended the denial of access to a priest to violate only the one right which applies

directly to that circumstance: the right "[t]o have visits from members of the clergy at any time" (Cal. Code Regs., tit. 22, § 72527, subd. (a)(19))?

Trial judges must likewise routinely determine whether a defendant's conduct constitutes a single violation or a continuous, ongoing violation. They do so in a range of legal contexts, from trespass (see *Skokomish Indian Tribe v. U.S.* (9th Cir. 2005) 410 F.3d 506, 518 ["To show a continuing violation, the plaintiff must demonstrate that the damage is 'reasonably abatable,' . . . which means that 'the condition . . . can be removed "without unreasonable hardship and expense" ' "]; see also *Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1374 (dis. opn. of Brown, J.) ["The instant case thus turns on the question of whether Intel deserves a remedy for the continuing violation of its rights. I believe it does, and as numerous cases have demonstrated, an injunction to prevent a trespass to chattels is an appropriate means of enforcement"]); to civil rights violations under Title 42 United States Code section 1983 (see, e.g., *Young v. King County* (9th Cir. 2003) 70 Fed. Appx. 939, 942 [to prove a continuing violation, a plaintiff must show either a "system or practice of discrimination" or that the " 'the alleged discriminatory acts are related closely enough to constitute a continuing violation' "]); to employment discrimination (see, e.g., *Comm. Concerning Cmty. Improvement v. City of Modesto* (9th Cir. 2009) 583 F.3d 690, 702 [partially affirming grant of summary judgment and upholding trial court finding that violation was not ongoing for purpose of statute of limitations]). Nowhere does the majority persuasively explain why such a doctrine would not apply here.

What the majority does is suggest that the application of a continuing violation theory or some other way of classifying

some separate acts as a single violation would mean that damages would no longer be scaled with wrongdoing. (Maj. opn., *ante*, at p. 21, fn. 6.) This is no more the case here than it would be in the UCL context where we applied it in *Jayhill*. The fact that certain actions, for example failing to have regular visitors' hours, might be conceived of as one "violation" despite the fact that it unfolds over multiple days does not mean that damages would not increase with new or more severe harms. First, certain rights should not be interpreted as a single, continuing violation. The right to be free from mental and physical abuse (Cal. Code Regs., tit. 22, § 72527, subd. (a)(10)), for example, would clearly be violated multiple times by multiple instances of abuse. Second, for ongoing violations, it seems likely that a jury might be inclined to award damages closer to the $500 cap where a violation continues over a long period of time. Finally, a nursing home that, for example, does not inform a patient that another resident or staff member has tested positive for COVID-19 — arguably a violation of the right to "be fully informed . . . of his or her total health status" (Cal. Code Regs., tit. 22, § 72527, subd. (a)(3)) — and also administers unnecessary psychotherapeutic drugs on the patient — likely a violation of the right to be free from such drugs when used for patient discipline or staff convenience — would be liable for both rights violations. Continuing violations and grouping related violations of the same right, as we do in the UCL context, are but two theories that might help us define a "violation." Whichever variation on this violation-distinction theme

resonates most is not for us to decide here,[3] but it underscores a broader point: that the challenge of counting violations is far from inexorably doomed to failure.

Nor is it clear that the majority's approach truly eliminates the need to define a violation. The Attorney General is still permitted to bring suit under section 1430(a), and such suits, the majority acknowledges, allow for up to $1,000 for "each and every" class B violation, and up to $10,000 for "each and every" class A violation. (§ 1424, subds. (d) & (e).) Class B offenses include violations of the Patients Bill of Rights that are "determined by the state department to cause or under circumstances likely to cause significant humiliation, indignity, anxiety, or other emotional trauma to a patient." (§ 1424, subd. (e).) So courts will still need a way to differentiate between violations for the purposes of at least suits for class B violations under section 1430(a).

Even for private suits under section 1430(b), the majority's interpretation does not fully sidestep this issue. Claim and issue preclusion, the majority contends, will likely block attempts by plaintiffs to maneuver around the $500 per lawsuit cap by filing multiple lawsuits. (Maj. opn., *ante*, at pp. 21–22.) But to determine whether a claim is precluded, eventually a court will need to decide whether certain conduct gave rise to a violation, or multiple violations, of the Patients Bill of Rights.

A well-functioning Legislature does not sidestep deliberation about statutory changes merely because a problem is complex, or because it's daunting to address every aspect of it.

---

[3] Indeed, on the record before us we have no ability to do so. The jury did not make findings as to what the 382 violations were, so there is nothing for us to review.

Nor does the executive branch refuse to enforce the law because such enforcement might require difficult tradeoffs or nuanced decision-making. Yet in today's decision the majority risks falling into an analogous trap: avoiding a demanding line-drawing problem by conveniently reading it out of the statute, and in the process, eviscerating a most compelling means through which a vulnerable population can make nursing homes take seriously their residents' demands.

## IV.

The Long-Term Care Act was enacted to protect the rights of nursing home patients, and section 1430(b) serves as one of its key remedial provisions. Even if one treats the language in this provision as somewhat ambiguous, the relevant legislative history and statutory structure are most consistent with the conclusion that this provision created a new private enforcement mechanism allowing penalties for violations to be imposed in the amount of up to $500 per violation in damages. Per-violation damages support the statute's deterrent function, and other private and public enforcement mechanisms are not suited to fill the void created by the majority's decision today.

The majority cautions that we must not legislate, as if any disagreement with its penchant for construing the $500 limit on the penalty against the licensee of a facility "who violates any rights" (§ 1430(b)) as a per lawsuit cap would somehow entail this court's occupation of the State Capitol. (See maj. opn., *ante*, at p. 22.) But it's not "legislating" to recognize — as the majority does — that the language of section 1430(b) is "far from clear," nor is it legislating to acknowledge that the statutory language refers to "rights" in the plural, or to find no support in the statute's purpose or structural logic after (as the majority

25

entreats us to) "look[ing] to the Long-Term Care Act as a whole" for a reading that makes the penalty for violations almost purely symbolic, sounding in the key of a faint whimper rather than a remedy. (See maj. opn., *ante*, at p. 6.) That the Legislature can "make any necessary adjustments" (*id.* at p. 22) — and given the majority's reading of the statute, probably should — follows from its role under our Constitution. Equally plain is our own: to make sense of how to read statutes that are "far from clear," and to do so in a way that makes sense of their language and "effectuate[s] the law's purpose." (*Id.* at pp. 6, 4.)

While the majority identifies practical concerns with the per-violation approach, the interpretation they select generates problems of its own, and fails to fully address the implementation issues they highlight. Section 1430(b) of the Long-Term Care Act is best read to authorize private lawsuits by nursing home patients for up to $500 per violation. That the majority has chosen to reject this reading may prompt the Legislature to repair the scheme and restore its more robust deterrent effect — along with, perhaps, greater clarity about defining violations when certain rights appear to overlap. But there's no basis for solving the majority's practical concerns about disentangling one violation from another by reading the statute to permit — no matter the number of transgressions or cumulative risk to nursing home residents' lives — a single $500 penalty per lawsuit. With respect, I dissent.

**CUÉLLAR, J.**

**I Concur:**

**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Jarman v. HCR ManorCare, Inc.

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XX 9 Cal.App.5th 807
**Rehearing Granted**


_____


**Opinion No.** S241431
**Date Filed:**  August 17, 2020

_____


**Court:**  Superior
**County:**  Riverside
**Judge:**  Phrasel L. Shelton and Mac R. Fisher


_____


**Counsel:**

Lanzone Morgan, Anthony C. Lanzone, Steffi A. Jose, Anna H. Cronk, Travis K. Siegel; Downey Brand and Jay-Allen Eisen for Plaintiff and Appellant.

Braunhagey & Borden, Matthew Borden, Adam Shapiro; William Alvarado Rivera; Janssen Malloy and W. Timothy Needham for AARP, AARP Foundation, Center for Medicare Advocacy, Consumer Attorneys of California, Justice in Aging, The Long Term Care Community Coalition and The National Consumer Voice for Quality Long-Term Care as Amici Curiae on behalf of Plaintiff and Appellant.

Anthony M. Chicotel for California Advocates for Nursing Home Reform, Inc., as Amicus Curiae on behalf of Plaintiff and Appellant.

Petrullo, John Patrick Petrullo, Carolyn Wu, Grace Song, Isaiah Costas; Manatt, Phelps & Phillips, Michael M. Berger, Barry S. Landsburg and Joanna S. McCallum for Defendants and Appellants.

Buchalter, Harry W.R. Chamberlain II and Robert M. Dato for Association of Southern California Defense Counsel as Amicus Curiae on behalf of Defendants and Appellants.

Fred J. Hiestand, Erika C. Fank and Heather L. Wallace for The Civil Justice Association of California and The California Chamber of Commerce as Amici Curiae on behalf of Defendants and Appellants.

Hooper, Lundy & Bookman, Mark E. Reagan and Jordan Kearney for California Association of Health Facilities as Amicus Curiae on behalf of Defendants and Appellants.

Cole Pedroza, Curtis A. Cole and Cassidy C. Davenport for California Medical Association, California Dental Association and California Hospital Association as Amici Curiae on behalf of Defendants and Appellants.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Barry S. Landsberg
Manatt, Phelps & Phillips, LLP
2049 Century Park East, 17th Floor
Los Angeles, CA 90067
(310) 312-4000

Jay-Allen Eisen
Downey Brand, LLP
621 Capitol Mall, 18th Floor
Sacramento, CA 95814
(916) 444-1000