Filed 8/24/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| RICHARD S. HIRSCHFIELD, as Trustee, etc., | B312960 |
| Plaintiff, Cross-complainant and Appellant, | (Los Angeles County Super. Ct. No. SC124349) |
| v. | |
| TANYA COHEN, | |
| Defendant; | |
| SANTA MONICA RENT CONTROL BOARD, | |
| Intervener, Cross-defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark A. Young, Judge. Affirmed.

Rosario Perry and Steven A. Coard for Plaintiff, Cross-complainant and Appellant.

Santa Monica Rent Control Board, Alison Regan and Hakhamanesh M. Mortezaie, for Intervener, Cross-defendant and Respondent.

_____

Richard Hirschfield appeals from a declaratory judgment finding the property he owns at 746 Marine Street in Santa Monica is subject to the City of Santa Monica's (City) rent control law.  In 1994 Hirschfield, as trustee of the Richard S. Hirschfield Trust, purchased four contiguous lots designated as 738 through 746 Marine Street in Santa Monica; the lots in turn contained five rental units that were spread over the four parcels.  In 2004 Hirschfield withdrew the five rental units from the residential rental market under the Ellis Act (Gov. Code, § 7060 et seq.).[1] Hirschfield demolished the existing structures and erected in their place four single-family dwellings, each located on a separate assessor parcel.  In 2009 Hirschfield rented the dwelling at 746 Marine Street (the property) to Tanya Cohen.

Hirschfield filed a complaint for declaratory relief against Cohen, and the Santa Monica Rent Control Board (Board) filed a complaint in intervention against Hirschfield.  In adjudicating the claims of Hirschfield and the Board, the trial court found the property was subject to rent control under section 7060.2, subdivision (d), of the Ellis Act (section 7060.2(d)), which authorizes local agencies to impose rent controls if "accommodations are demolished, and new accommodations are constructed on the same property, and offered for rent or lease

_____

[1] All further undesignated statutory references are to the Government Code.

within five years of the date the accommodations were withdrawn from rent or lease, . . . notwithstanding any exemption from the system of controls for newly constructed accommodations."

Hirschfield contends that because there is a now a single-family dwelling on the property, it is exempt from the City's rent control laws under the Costa-Hawkins Rental Housing Act (Civ. Code, § 1954.52 et seq.; Costa-Hawkins Act), which proscribes the imposition of rent controls on "a dwelling or a unit" that is "alienable separate from the title to any other dwelling unit . . . ." (*Id.*, subd. (a)(3)(A).)

We do not read the Costa-Hawkins Act so broadly to supersede the Ellis Act. Section 7060.2(d) of the Ellis Act applies to the single-family dwelling on Hirschfield's property notwithstanding the Costa-Hawkin Act's exemption from local rent control for separately alienable dwelling units, because the house is an "accommodation" under section 7060.2(d) of the Ellis Act; it was constructed on the same property as the five former rent-controlled units; and it was offered for rent within five years from when the five units were withdrawn from the rental market. The legislative history of the Ellis Act makes clear the Legislature intended to discourage landlords from evicting tenants from rent-controlled accommodations under the false pretense of leaving the rental business. This intent would be defeated if a landlord could evade rent control by evicting tenants and simply replacing one (or more) rent-controlled accommodations with a single-family dwelling. We affirm.

3

# FACTUAL AND PROCEDURAL BACKGROUND

A.      *Redevelopment of the Property*

The material facts are undisputed.  In 1994[2] Hirschfield purchased four contiguous lots in the City designated 738 through 746 Marine Street.  The four lots shared an assessor's parcel number and included three structures situated without precise regard to the lot lines, including two single-family dwellings and one three-unit multi-family dwelling.  The five units shared a single street address at 738 Marine Street (the units were sub-designated A, B, C, D, and E) and were used as rental units subject to the City's rent control law.

In 2004 Hirschfield decided to demolish the existing structures and build four single-family detached houses, each one on a separate lot, with the intention of selling three of the houses and living in the fourth.  On December 3, 2004 Hirschfield recorded a "notice of intention to withdraw accommodations from rent or lease" under the Ellis Act, section 7060.4, subdivision (a), terminated the existing tenancies, and provided the tenants with relocation assistance as provided by the City's regulations implementing the Ellis Act.[3]  In connection with the permitting

---

[2]     Although the trial court's order states Hirschfield purchased the property in 2004 (apparently based on a typographical error in the complaint), the parties do not dispute that Hirschfield purchased the property in 1994.

[3]     Section 7060.4, subdivision (a), of the Ellis Act authorizes a public agency to require the owner of a rent-controlled accommodation to notify the agency "of an intention to withdraw those accommodations from rent or lease."  The City implements the withdrawal provisions of the Ellis Act in Chapter 16 of the

4

process for the new construction, in 2006 the City's zoning administrator issued findings and determinations for each lot stating the new houses were exempt from rent control because they were single-family dwellings. Each lot was also assigned a separate assessor's parcel number.

In early 2009 Hirschfield completed construction of the four single-family houses and moved into the house at 738 Marine Street. On September 18, 2009 Hirschfield entered into a written lease agreement with Cohen to lease the house at 746 Marine Street for a one-year term at $4,900 per month. Hirschfield and Cohen later renewed the lease annually, with the last lease expiring at the end of 2012. Starting in January 2013, Cohen's tenancy continued as a month-to-month tenancy.

B. *The Rent Control Dispute*

In early 2013 Hirschfield notified Cohen of a rent increase to $5,300 a month, which she did not dispute. In June 2013 Hirschfield notified Cohen of another rent increase to $5,800 per month. Cohen complained to Hirschfield about the second increase, stating the property was subject to rent control and the increase exceeded the allowable adjustment. Hirschfield responded that the house was exempt from rent control because it was a single-family dwelling.

On July 23, 2013 a staff attorney with the Board sent a letter to Hirschfield stating all four of Hirschfield's houses on Marine Street were subject to rent control and must be registered

Santa Monica Rent Control Board Regulations pursuant to authority delegated to the Board by the Santa Monica Rent Control Charter Amendment (Santa Monica City Charter, art. XVIII, § 1803, subd. (g)).

with the Board.  Citing section 7060.2(d) and Board Regulation 1631,[4] the letter stated, "The Board has received a copy of a lease that shows that you rented one of those units, 746 Marine Street, on September 19, 2009.  Because you rented one of the new units less than five years after the withdrawal of the demolished units, all four parcels are again subject to the rent control law." Hirschfield's attorney responded with a letter stating the new units were exempt from rent control because they were single-family dwellings.

On October 17, 2013 Cohen filed an administrative complaint with the Board alleging the property was subject to rent control, and that Hirschfield failed to register her tenancy and increased her rent illegally.  However, later that year Cohen and Hirschfield entered into a settlement agreement and mutual release resolving her complaint, in which Hirschfield agreed to pay Cohen for excess rent collected, and the parties agreed the "current lawful rent" beginning in January 2014 was $5,058.54 per month.

---

[4]     Board Regulation 1631 is the local implementation of section 7060.2(d) and provides in relevant part, "If the accommodations are demolished, and new accommodations are constructed on the same property, and offered for rent or lease within five years of the date the accommodations were withdrawn from rent or lease:  [¶]  (a) The newly constructed accommodations shall be subject to the Rent Control Law [Santa Monica City Charter, art. XVIII, § 1800 et seq.], notwithstanding subsection 1801(c)(5) of said law [i.e., exempting new construction].  This section shall apply to all units constructed on the formerly withdrawn property, regardless of the number of units withdrawn."

6

C.    *The Declaratory Relief Action*

On June 18, 2015 Hirschfield filed a complaint against Cohen alleging a single cause of action for declaratory relief, seeking a judicial declaration that as a detached single-family dwelling on its own separately alienable lot, the property was not subject to rent control, and Hirschfield could increase Cohen's rent beyond the adjustments allowable under the City's rent control law.  On August 4, 2015 the Board filed a complaint in intervention against Hirschfield, seeking a judicial declaration that the property was subject to rent control.[5]  Hirschfield filed a cross-complaint against the Board seeking a declaration that all four of the units on Marine Street were exempt from rent control as single-family dwellings on separately alienable lots.

On July 2, 2020 the trial court ordered briefing and set a bench trial on the Board's complaint in intervention and Hirschfield's cross-complaint.  At the final pretrial conference, the parties stipulated in lieu of a trial that the court could "resolve the fully briefed legal issue as to whether [Hirschfield's]

---

[5]    On August 17, 2015 Cohen filed a cross-complaint against Hirschfield, alleging Hirschfield violated Civil Code section 1940.2 by using threats of force to try to evict her, and that he violated Santa Monica Municipal Code section 4.56.020 by failing to provide required housing services, failing to perform repairs and maintenance, verbally abusing her, threatening her with physical harm, and otherwise interfering with her quiet enjoyment of the property.  Cohen's cross-complaint is not at issue in this appeal.  Cohen also filed a special motion to strike Hirschfield's complaint (Code Civ. Proc., § 425.16), which the trial court denied.  We affirmed the denial of the motion in *Hirschfield v. Cohen* (Mar. 27, 2018, B267706) (nonpub. opn.).

property, which was rented by defendant Cohen, is subject to rent control."

On October 14, 2020 the trial court issued a four-page proposed order and statement of decision.[6] The court described the stipulated legal question before it as follows: "Does California's Ellis Act, Government Code section 7060.2(d), which places 'new construction' back under rent control if the newly constructed unit is re-rented within five years of the date of withdrawal of the original rent-controlled apartments, also apply to dwellings that are alienable separate from the title of any other dwelling unit pursuant to Civil Code Section 1954.52(a)(3)(A)[?]" The court answered in the affirmative, reasoning that *Apartment Assn. of Los Angeles County Inc. v. City of Los Angeles*, (2009) 173 Cal.App.4th 13 (*Apartment Association*) was "compellingly on point."

In *Apartment Association*, Division Three of this district examined the interplay between section 7060.2(d) and Civil Code section 1954.52, subdivision (a)(1), of the Costa-Hawkins Act. The latter section exempts from rent control a dwelling that has a certificate of occupancy issued after February 1, 1995. Division Three considered the legislative history and public policy behind the two laws and concluded the statutes could be harmonized by construing section 7060.2(d) as an exception to Civil Code section 1954.52, subdivision (a)(1)'s exemption for new construction. (*Apartment Association, supra*, 173 Cal.App.4th at pp. 25-26.) The court explained the purpose of the Ellis Act was to allow cities to "promulgate ordinances that discourage

---

[6] The record does not reflect that a hearing was held prior to issuance of the proposed order and statement of decision.

8

landlords from evicting their tenants under the false pretense of going out of business pursuant to the Ellis Act," a purpose that would be frustrated if the Costa-Hawkins Act superseded section 7060.2(d). (*Apartment Association*, at p. 27.)

Here, the trial court reasoned that the analysis in *Apartment Association* applied equally to the interplay between section 7060.2(d) and the exemption for separately alienable dwelling units in Civil Code section 1954.52, subdivision (a)(3)(A): "To adopt [Hirschfield's] argument, the [c]ourt would take a position inconsistent with that taken by the Court of Appeal in *Apartment Association*, and impose a needlessly restrictive view of the Ellis Act. [Hirschfield's] position would thwart the Ellis Act's prime objective—preventing evictions based upon false pretenses. The Court does not believe that position is warranted." The trial court concluded, "[I]f a landlord demolishes a residential rental unit and builds new residential rental units on the same property, even if these new units are separately alienable from the title to any other dwelling unit, and rents these new units within five years, then these new rental units are also subject to rent control law as set forth in Gov. Code § 7060.2(d). Under the agreed upon facts of this case, 746 Marine Street would be subject to Santa Monica's rent control law."

On November 4, 2020, after receiving the parties' objections to the proposed statement of decision, the trial court issued a modified and final statement of decision substantially adopting the proposed statement of decision.[7] On February 26, 2021 the

---

[7] On our own motion we augment the record to include the November 4, 2020 final statement of decision. (Cal. Rules of Court, rule 8.155(a)(1)(A).)

9

court entered a judgment incorporating the statement of decision, holding the decision "disposes of the entirety of the action for declaratory relief in which the Board had intervened, and in which the Board had been sued as a defendant," and the court entered judgment for the Board against Hirschfield.[8] Hirschfield timely appealed.[9]

---

[8] On January 13, 2022 the Board requested we augment the record to include the trial court's February 26, 2021 minute order (entered on the date of the judgment), which explained that the judgment resolved Hirschfield's claim for declaratory relief as to all four units. We granted the Board's motion. As stated in the February 26 order, Hirschfield argued the trial court's statement of decision failed to resolve the entirety of his cross-complaint because he sought a declaration that all four of his Marine Street properties were exempt from rent control. The trial court rejected this argument, finding the court's conclusion that separately alienable rental units are subject to recontrol under section 7060.2(d) "resolved the parties' controversy," and "[i]f necessary, the parties may apply the facts to the Court's ruling with respect to the remaining three parcels." Hirschfield does not contend on appeal that the judgment did not fully resolve his cross-complaint for declaratory relief.

[9] On January 18, 2022, Cohen filed an application to join the Board's respondent's brief as a real party in interest. After inviting Cohen to submit authority supporting her application, on January 24, 2022 we denied the application because Cohen's claims against Hirschfield remained pending and Cohen was not a party to the judgment; therefore, Hirschfield properly omitted Cohen as a respondent in this appeal.

## DISCUSSION

A. *Standard of Review*

A trial court's decision to grant or deny declaratory relief is typically reviewed for abuse of discretion. (*Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 647; accord, *Hott v. College of Sequoias Community College Dist.* (2016) 3 Cal.App.5th 84, 96 ["'[w]hether a determination is proper in an action for declaratory relief is a matter within the trial court's discretion and the court's decision to grant or deny relief will not be disturbed on appeal unless it is clearly shown its discretion was abused'"].) However, "[i]n a declaratory relief action where . . . the decisive underlying facts are undisputed, our review of the propriety of the trial court's decision presents a question of law which we review de novo." (*Hott*, at p. 95; accord, *Dolan-King v. Rancho Santa Fe Assn.* (2000) 81 Cal.App.4th 965, 974.) Moreover, the interpretation of state statutes entails resolution of a pure question of law, which we also review de novo. (*California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1041 ["We review questions of statutory construction de novo."]; accord, *Wang v. City of Sacramento Police Dept.* (2021) 68 Cal.App.5th 372, 378; see *Carson Citizens for Reform v. Kawagoe* (2009) 178 Cal.App.4th 357, 366 [review of declaratory relief is generally for abuse of discretion, but where issue is one of statutory interpretation on undisputed facts, de novo review is appropriate].)

Here, the parties agree the material facts are undisputed, and the appeal presents a question of statutory interpretation we review de novo.

11

B.      *Principles of Statutory Interpretation*

When interpreting a statute, "our core task . . . is to determine and give effect to the Legislature's underlying purpose in enacting the statutes at issue." (*McHugh v. Protective Life Ins. Co.* (2021) 12 Cal.5th 213, 227 (*McHugh*); accord *Jarman v. HCR ManorCare, Inc.* (2020) 10 Cal.5th 375, 381 (*Jarman*).)  "We first consider the words of the statutes, as statutory language is generally the most reliable indicator of legislation's intended purpose.  [Citation.]  We consider the ordinary meaning of the relevant terms, related provisions, terms used in other parts of the statute, and the structure of the statutory scheme." (*McHugh*, at p. 227; accord, *Jarman*, at p. 381 ["'We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment.'"].)  "It is a basic canon of statutory construction that statutes in pari materia should be construed together so that all parts of the statutory scheme are given effect." (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1090-1091; accord, *Law Finance Group, LLC v. Key* (2021) 67 Cal.App.5th 307, 317.)

"We have long recognized the principle that even though a statute may appear to be unambiguous on its face, when it is considered in light of closely related statutes a legislative purpose may emerge that is inconsistent with, and controlling over, the language read without reference to the entire scheme of the law." (*Droeger v. Friedman, Sloan & Ross* (1991) 54 Cal.3d 26, 50.)  "'If two seemingly inconsistent statutes conflict, the court's role is to harmonize the law.  [Citations.]  We presume that the Legislature, when enacting a statute, was aware of existing related laws and intended to maintain a consistent body of

12

rules.'" (*Apartment Association, supra*, 173 Cal.App.4th at p. 21; accord, *Moore v. Superior Court of Riverside County* (2020) 58 Cal.App.5th 561, 574.)

"'If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend.'" (*Jarman, supra*, 10 Cal.5th at p. 381.)  However, "[i]f the relevant statutory language is ambiguous, we look to appropriate extrinsic sources, including the legislative history, for further insights." (*McHugh, supra*, 12 Cal.5th at p. 227; accord, *Mendoza v. Fonseca McElroy Grinding Co., Inc.* (2021) 11 Cal.5th 1118, 1125 ["'If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.'"].)

C.      *Relevant Statutory Provisions*
        1.      *The Ellis Act*
The Ellis Act, enacted in 1985, provides, "No public entity . . . shall, by statute, ordinance, or regulation, or by administrative action implementing any statute, ordinance or regulation, compel the owner of any residential real property to offer, or to continue to offer, accommodations in the property for rent or lease . . . ."[10]  (§ 7060, subd. (a).)  Section 7060.7 makes

---

[10]     "Accommodations" are defined in the Ellis Act as "residential rental units in any detached physical structure containing four or more residential rental units" (§ 7060, subd. (b)(1)(A)) or, "[w]ith respect to a detached physical structure containing three or fewer residential rental units, the residential rental units in that structure and in any other

clear the Legislature's intent that a landlord has an absolute right "to go out of business."  However, the Act affirms public entities' authority to regulate a landlord's withdrawal from the rental housing market.  Among other things, public entities may impose notice requirements and withdrawal procedures (§ 7060.4); they retain the power to make and enforce laws and regulations "to mitigate any adverse impact on persons displaced by reason of the withdrawal" (§ 7060.1, subd. (c)); and they may "grant or deny any entitlement to the use of real property, including, but not limited to, planning, zoning, and subdivision map approvals" (*id*., subd. (b)).  Section 7060.7 further provides the Ellis Act is not intended to "[i]nterfere with local governmental authority over land use," "[p]reempt local . . . land use regulations, procedures, or controls that govern the demolition and redevelopment of residential property," or "[o]verride procedural protections designed to prevent abuse of the right to evict tenants."  (§ 7060.7, subds. (a)-(c).)  "Considered in its entirety, 'the Ellis Act does not prohibit local governments from providing procedural protections designed to prevent abuse of the right to evict tenants (§ 7060.7, subd. (c)), [but] it "completely occupies the field of substantive eviction controls over landlords who wish to withdraw" all units from the residential rental market.'" (*San Francisco Apartment Assn. v. City and County of San Francisco* (2016) 3 Cal.App.5th 463, 478.)

Section 7060.2 establishes the circumstances under which property withdrawn from the rental market under the Ellis Act can become subject again to rent control, commonly referred to as

structure located on the same parcel of land, including any detached physical structure . . . ."  (§ 7060, subd. (b)(1)(B).)

recontrol.  Section 7060.2 provides, "If a public entity, by valid exercise of its police power, has in effect any control or system of control on the price at which accommodations may be offered for rent or lease, that entity may, notwithstanding any provision of this chapter, provide by statute or ordinance, or by regulation . . . , that any accommodations which have been offered for rent or lease and which were subject to that control or system of control at the time the accommodations were withdrawn from rent or lease, shall be subject to" recontrol under specified circumstances.  For example, if accommodations are offered for rent within 10 years of withdrawal, the public entity may require the landlord to offer the accommodations first to displaced tenants.  (§ 7060.2, subd. (c).)  If the accommodations are offered for rent within five years of withdrawal, they must be offered at the rents in place at the time of withdrawal, plus annual adjustments authorized under the rent control law.  (*Id.*, subd. (a).)  And if the accommodations are offered for rent within two years of withdrawal, they are treated as if they were not withdrawn, and the landlord must offer the accommodations to displaced tenants and may be liable for actual and exemplary damages for displacement of the tenants.  (*Id.*, subd. (b).)

Section 7060.2(d) applies when withdrawn accommodations are demolished.  Section 7060.2(d) provides, "If the accommodations are demolished, and new accommodations are constructed on the same property, and offered for rent or lease within five years of the date the accommodations were withdrawn from rent or lease, the newly constructed accommodations shall be subject to any system of controls on the price at which they would be offered on the basis of a fair and reasonable return on the newly constructed accommodations,

15

notwithstanding any exemption from the system of controls for newly constructed accommodations."

### 2. *The Costa-Hawkins Act*

The Costa-Hawkins Act, enacted in 1995, generally prohibits public entities from applying rent control laws to certain categories of dwellings, including newly constructed rental units. (*Apartment Association, supra*, 173 Cal.App.4th at p. 24.) Further, the Act prohibits public entities from regulating the rents at which vacant dwellings may be offered to the public, known as vacancy decontrol. (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1237; *Apartment Association*, at p. 24; see Civil Code, § 1954.53, subd. (a).)

Civil Code section 1954.52, subdivision (a), provides, "Notwithstanding any other provision of law, an owner of residential real property may establish initial and all subsequent rental rates for a dwelling or a unit about which any of the following is true:  [¶]  (1) It has a certificate of occupancy issued after February 1, 1995.  [¶]  (2) It has already been exempt from the residential rent control ordinance of a public entity on or before February 1, 1995, pursuant to a local exemption for newly constructed units.  [¶]  (3)(A) It is alienable separate from the title to any other dwelling unit or is a subdivided interest in a subdivision, as specified in . . . the Business and Professions Code."[11]  "'The effect of this provision was to permit landlords 'to

---

[11]    The subdivision exemption is limited under Business and Professions Code section 11004.5, subdivisions (b), (d), and (f), to community apartment projects, stock cooperatives, and interests in these and similar entities for shared property ownership not at issue here.

16

impose whatever rent they choose at the commencement of a tenancy.'" (*Action Apartment Assn., Inc. v. City of Santa Monica, supra*, 41 Cal.4th at p. 1237.)

D. *Section 7060.2(d) of the Ellis Act Applies to Replacement of Multi-unit Apartments with Single-family Dwellings*

Section 7060.2(d)'s provision for replacement of demolished rent-controlled units draws no distinction between multi-unit dwellings and single-family dwellings—it simply provides that if rent-controlled "accommodations are demolished, and new accommodations are constructed on the same property," the new accommodations are subject to rent control if offered for rent or lease within five years of withdrawal. And as discussed, the Ellis Act defines "[a]ccommodations" to include not only multi-unit structures but "detached physical structure[s] containing three or fewer residential rental units," which would include single-family dwellings. (§ 7060, subd. (b)(1)(A), (B).)

The Board contends that because section 7060.2(d) clearly applies to single-family dwellings, Hirschfield's property falls within the recontrol provision, and our inquiry ends there. But even where a statute appears unambiguous on its face, we do not examine the language in isolation, but rather, in the context of the entire statutory system and closely related statutes. (*Jarman, supra*, 10 Cal.5th at p. 382; *Droeger v. Friedman, Sloan & Ross, supra*, 54 Cal.3d at pp. 43, 50.) In contrast to the Ellis Act, the Costa-Hawkins Act distinguishes between types of accommodations, unambiguously exempting single-family

17

dwellings[12] from rent control "[n]otwithstanding any other provision of law." (Civ. Code, §1954.52, subd. (a)(3)(A).)

Hirschfield contends an interpretation of section 7060(d) of the Ellis Act to apply its limits on replacement of demolished rent-controlled units to new single-family dwellings places the Ellis Act in direct conflict with the Costa-Hawkins Act. In making this argument, Hirschfield highlights that section 7060.2(d) includes an express exemption for new construction, stating recontrol of demolished accommodations applies "notwithstanding any exemption from the system of controls for newly constructed accommodations," while remaining silent as to single-family dwellings. As Hirschfield argues, "If the Rent Board's position were correct . . . [t]he [L]egislature could have simply omitted the final clause of the operative provision so that single family dwellings would be automatically included within the sweep of section 7060.2(d) . . . ."

Construing the Ellis and Costa-Hawkins Acts together, as we must, given that they address the same subject matter (*Law Finance Group, LLC v. Key, supra*, 67 Cal.App.5th at p. 317), we conclude section 7060.2(d) is ambiguous with respect to whether it applies to the replacement of rent-controlled units with single-

_____

[12] We agree with Hirschfield that for purposes of our analysis, the statutory language in Civil Code section 1954.52, subdivision (a)(3)(A), which applies to a dwelling or unit that is "alienable separate from the title to any other dwelling unit," includes a single-family dwelling. Because this case involves replacement of a rent-controlled, multi-unit dwelling with a single-family dwelling, we discuss separately alienable dwelling units under this Civil Code section in the context of single-family dwellings. Our analysis would apply similarly to other types of separately alienable dwelling units.

family dwellings.  Accordingly, we turn to the legislative history and relevant extrinsic evidence to determine legislative intent. (*McHugh, supra*, 12 Cal.5th at p. 227; *Mendoza v. Fonseca McElroy Grinding Co., Inc., supra*, 11 Cal.5th at p. 1125.)

The Legislature adopted the Ellis Act in direct response to *Nash v. City of Santa Monica* (1984) 37 Cal.3d 97, in which the Supreme Court upheld a Santa Monica ordinance requiring property owners to obtain Board approval before demolishing rental housing or converting it to condominiums.  (See § 7060.7 ["It is the intent of the Legislature in enacting this chapter to supersede any holding or portion of any holding in [*Nash*] to the extent that the holding, or portion of the holding, conflicts with this chapter, so as to permit landlords to go out of business"]; see also *Apartment Association, supra*, 173 Cal.App.4th at pp. 22-23 ["The purpose of the Ellis Act 'is to allow landlords who comply with its terms to go out of the residential rental business by evicting their tenants and withdrawing all units from the market'"].)

Senate Bill No. 505 (Senate Bill 505), which enacted the Ellis Act, did not initially include section 7060.2.  (Sen. Bill 505 (1985-1986 Reg. Sess.) § 1, as introduced Feb. 20, 1985.) However, opponents of Senate Bill 505 argued the proposed law would undermine local rent control ordinances and state laws protecting tenants.  As the Senate Judiciary Committee report explained, "Opponents assert that the bill would 'back-door' local rent control ordinances by limiting the effectiveness of eviction standards and measures to preserve housing.  They allege that this bill could permit property owners to take a unit off the market and evict the tenant under the pretext of going out business, then relet the property as a new rental 6 months later.

19

Opponents state that eviction protections are a frequently used, reasonable, and effective legislative response to the housing shortages, and that when a severe housing shortage exists, a city is best able to meet its obligations by preserving existing housing and prohibiting arbitrary evictions, demolitions, and conversions." (Sen. Com. on Judiciary, Rep. on Sen. Bill 505 (1985-1986 Reg. Sess.) as amended Apr. 18, 1985, p. 4.)

The recontrol provisions of section 7060.2 were added to Senate Bill 505, along with other amendments, to address these concerns. (See Sen. Com. on Judiciary, Analysis of Sen. Bill 505 (1985-1986 Reg. Sess.) as amended May 15, 1985, p. 5 ["In response to concerns that the bill could permit property owners to evade rent control and other laws by ceasing to rent under the guise of going out of business, the bill has been amended to provide some safeguards against abuse."]; Assem. Com. on Judiciary, 3d reading analysis of Sen. Bill 505 (1985-1986 Reg. Sess.) as amended Aug. 28, 1985, p. 4 ["This bill contains several provisions designed to prevent landlords from using its provisions to evade rent control and other laws by ceasing to rent under the guise of going out of business."].)

The Senate Judiciary Committee in its report following the May 15, 1985 amendment to Senate Bill 505 identified eight safeguards that had been incorporated into the bill to prevent the improper removal of housing units from the rental market, four of which remain as part of section 7060.2, including recontrol if a landlord offers to rent or lease accommodations within specified time periods after withdrawal or demolition and reconstruction. (Sen. Com. on Judiciary, Analysis of Sen. Bill 505 (1985-1986 Reg. Sess.) as amended May 15, 1985, pp. 5-7.) As to demolition recontrol, the report stated, "If the rental units were withdrawn

20

from the marketplace and demolished and new rental units were constructed in its place within 5 years of the date of withdrawal, the new units could be subject to the local rent controls notwithstanding any local exemption for new construction." (*Id.* at p. 7.)[13]

During the same legislative session, Assembly Member Jim Costa introduced Assembly Bill No. 483 (Assembly Bill 483), which would have created exemptions to rent control similar to those adopted a decade later in the Costa-Hawkins Act (introduced by Assembly Member Hawkins and coauthored by then-Senator Costa).[14] Like the Costa-Hawkins Act, Assembly Bill 483 would have imposed statewide vacancy decontrol, and it included exemptions from rent control for new construction and single-family dwellings. Specifically, Assembly Bill 483 proposed to amend the Civil Code to provide, "Notwithstanding any other provision of law, an owner of real property may establish the rental rate for a rental unit . . . which is first occupied by a tenant or lessee after the effective date of this section," except in circumstances not relevant here. (Assem. Bill 483 (1985-1986 Reg. Sess.) as amended June 20, 1985, § 2.) The bill would also

_____

[13] Other safeguards included a statement of legislative intent that the Ellis Act was not intended to "interfere with local governmental authority over land use" or "[o]veride procedural protections to prevent abuse of the right to evict tenants." (Sen. Com. on Judiciary, Analysis of Sen. Bill 505 (1985-1986 Reg. Sess.) as amended May 15, 1985, p. 9; see § 7060.7, subds. (b) & (c).)

[14] In 1995 then-Senator Costa introduced Senate Bill No. 1257 (1995-1996 Reg. Sess.), which passed the Senate and was later combined with Assembly Bill No. 1164 (1995-1996 Reg. Sess.) to become the Costa-Hawkins Act.

have amended the Civil Code to provide, "Notwithstanding any other provision of law, an owner of real property may establish the rental rate for a dwelling unit . . . if fee title to the dwelling unit is separate from title to any other dwelling unit or if the dwelling unit is a subdivided interest in a subdivision . . . ." (*Ibid.*, § 3.)

Thus, the issue of statewide exemptions for both new construction and single-family dwellings was before the Legislature as it considered the Ellis Act. And among the safeguards addressed by the May 15, 1985 amendments to Senate Bill 505 were express provisions that the Ellis Act's recontrol provisions would take precedence over the vacancy decontrol provisions of Assembly Bill 483. As the Senate Judiciary Committee report explained, "AB 483 (Costa) would permit landlords to increase the rental rate without regard to local rent control laws whenever a unit was vacated under specified circumstances . . . . In response to concerns that the provisions of that bill do not preempt this bill if both are enacted, this bill provides that the recontrol provisions of this bill would prevail over the provisions of AB 483." (Sen. Com. on Judiciary, Analysis of Sen. Bill 505 (1985-1986 Reg. Sess.) as amended May 15, 1985, p. 9; see Assem. Com. on Judiciary, 3d reading analysis of Sen. Bill 505 (1985-1986 Reg. Sess.) as amended Aug. 28, 1985, p. 4 [The amended bill "[p]rovides that the recontrol provisions of this bill would prevail over any conflicting provisions in AB 483 (Costa), if that bill is enacted"].)

Further, the May 15, 1985 amendments to Senate Bill 505 addressed Assembly Bill 483 by, among other changes, amending the demolition recontrol provision to read that if accommodations were demolished and new accommodations constructed on the

same property and offered for rent or lease within five years, the newly constructed accommodations would be subject to rent control, "notwithstanding any exemption from such a system of controls for newly constructed accommodations*, including any such exemption enacted by Assembly Bill No. 483* of the 1985-86 Regular Session of the Legislature, if enacted." (Sen. Bill 505 (1985-1986 Reg. Sess.) as amended May 15, 1985, § 1, p. 5, italics added.) This and other references to Assembly Bill 483 were removed by an August 28, 1985 amendment after Assembly Bill 483 failed, but the final version of Assembly Bill 505 retained the phrase "notwithstanding any exemption from such a system of controls for newly constructed accommodations." (Stats. 1985, ch. 1509, § 1, p. 5563; Sen. Bill 505 (1985-1986 Reg. Sess.) as amended May 15, 1985, § 1)

We conclude based on the May 15, 1985 amendments to Senate Bill 505 to address opponents' concerns that landlords might engage in fraudulent withdrawals of rental units to circumvent rent control, as well as the later amendments to Senate Bill 505 to address concerns that Assembly Bill 483 (the former version of the Costa-Hawkins Act) could be construed to supersede recontrol protections, that the Legislature intended the specific recontrol provisions in section 7060.2(d) to prevail over general decontrol provisions, such as those found in the later-enacted Costa-Hawkins Act. We also note that section 7060.2(d) of the Ellis Act was amended in a nonsubstantive manner in 2002 (Stat. 2002, ch. 301 (Sen. Bill No. 1403 (2002-2003 Reg. Sess.) § 5)), which as the court in *Apartment Association, supra*, 173 Cal.App.4th at page 29 observed, "shows that after Costa-Hawkins was enacted, the Legislature continued to regard section 7060.2, subdivision (d) as the law of this state."

23

To exempt from section 7060.2(d)'s recontrol provisions a newly constructed single-family dwelling that is rented or leased on property formerly occupied by multi-unit dwellings that were subject to rent control but subsequently demolished would frustrate the clear legislative intent that landlords not be able to evade rent control by simply demolishing rent-controlled units and replacing them with new units that would not otherwise be subject to rent control.[15] Further, any other reading of section 7060.2(d)'s recontrol provisions would create an economic incentive for landlords to replace multi-unit rental accommodations with single-unit dwellings that diminish the housing supply.[16] Moreover, the Ellis Act was enacted to

---

[15] Because we conclude section 7060.2(d) applies to single-family dwellings, we do not reach the Board's contention that the properties on Marine Street are not, as a matter of municipal law, "single-family homes" because each is contiguous with another parcel also owned by Hirschfield. (See Santa Monica City Charter, art. XVIII, § 1801(n) [defining "Single Family Home" as "[a] property that has been developed with only one one-family dwelling and any lawfully accessory structures"] and § 1801(m) [defining "Property" as "[a]ll rental units on a parcel or lot or contiguous parcels or contiguous lots under common ownership"].)

[16] Section 7060.2(d) does not require a landlord to base initial rents for newly constructed accommodations on the rents in effect at the time of demolition of the former units; rather, the new accommodations "shall be subject to any system of controls on the price at which they would be offered on the basis of a fair and reasonable return on the newly constructed accommodations." Thus, landlords retain an economic incentive to modernize rental housing and receive a reasonable rate of return while providing

24

guarantee a landlord the right "to go out of business." (§ 7060.7.) A landlord who, like Hirschfield, replaces multi-unit dwellings with a single-family dwelling for rent has not gone out of the rental business.

Our reading of the Legislature's intent is consistent with the legislative history of the Costa-Hawkins Act, which "indicates that the Legislature did not intend for Costa-Hawkins to affect the rights of tenants who were already living in residential units subject to rent control." (*Apartment Association, supra*, 173 Cal.App.4th at p. 25, fn. 9; see Enrolled Bill Rep. on Assem. Bill No. 1164 (1995–1996 Reg. Sess.) July 27, 1995, p. 5 ["[t]he intent of the sponsor is to permit the operation of rent controls that affect an existing tenant but to limit the ability of localities to control rent setting when rental housing is vacated"]; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1164 (1995-1996 Reg. Sess.) as amended July 20, 1995, p. 3 [the bill would "[p]reempt local rent controls on the rental of 'single family' dwellings, but preserves protections for existing tenants"].) Thus, under section 1954.52, subdivision (a)(3)(C), where a dwelling that is "alienable separate from the title to any other dwelling unit" (including a single-family dwelling) was subject to rent control as of January 1, 1995, the landlord would only be entitled to establish a new rental rate (not subject to rent control) for tenancies created on or after January 1, 1996 (§ 1954.52, subd. (a)(3)(C)(i)), or for tenancies that were in effect on January 1, 1995 "where the tenant has voluntarily vacated, abandoned, or been evicted pursuant to [the procedures

_____

new tenants with the protection of capped subsequent rent increases.

for unlawful detainer]" (*id.*, subd. (a)(3)(C)(iii)).  Similar to the Costa-Hawkins Act, which allowed rent-control to continue for existing tenancies in single-family dwellings that were rented or leased as of January 1, 1995, under the Ellis Act, a single-family dwelling would be subject to rent control if it replaced a demolished multi-unit dwelling, single-family dwelling, or other dwelling where the dwelling was previously subject to rent control.

We are unpersuaded by Hirschfield's argument that the express inclusion in section 7060.2(d) of language clarifying that its recontrol provision applies to demolition of accommodations notwithstanding any exemption from rent control for newly constructed accommodations implies a legislative intent not to provide a similar exception for single-family dwellings.  By definition, every application of section 7060.2(d) involves the construction of new accommodations in place of demolished accommodations, and thus, inclusion of an express provision clarifying the inapplicability of the exemption from rent control for new construction avoids any ambiguity that might otherwise render the section meaningless.[17]

---

[17]     Similarly, virtually every case of recontrol based on the withdrawal of accommodations under section 7060.2, subdivision (a), will involve premises vacated by the prior tenants.  Thus, section 7060.2, subdivision (a)(3), contains language clarifying that recontrol "prevail[s] over any conflicting provision of law authorizing the landlord to establish the rental rate upon the initial hiring of the accommodations."  Otherwise, the statute could have been read to allow the vacancy decontrol provisions to prevail over section 7060.2, subdivision (a)'s recontrol provisions.

*Apartment Association, supra*, 173 Cal.App.4th 13 supports our conclusion in recognizing the primacy of section 7060.2(d). The *Apartment Association* court reconciled the recontrol provision in section 7060.2(d) with the exemption from rent control for new construction in Civil Code section 1954.52, subdivision (a)(1), by construing section 7060.2(d) as an exception to that exemption. (*Apartment Association*, at p. 25.) In reaching this conclusion, the court reasoned that section 7060(d) was entitled to preference as the more specific statute "because it only deals with certain newly constructed residential rental units that replace units withdrawn under the Ellis Act, whereas Civil Code section 1954.52, subdivision (a)(1) deals more generally with all newly constructed residential rental units that were issued a certificate of occupancy after February 1, 1995." (*Apartment Association*, at pp. 27-28.) Just as the Ellis and Costa-Hawkins Acts can best be reconciled by construing the recontrol provision in section 7060.2(d) as an exception to section 1954.52, subdivision (a)(1)'s exemption from rent control for new construction, we construe section 7060.2(d) as an exception to section 1954.52, subdivision (a)(3)'s exemption from rent control for single-family dwellings.

27

## DISPOSITION

The judgment is affirmed.  The Board is to recover its costs on appeal.


FEUER, J.

We concur:


PERLUSS, P.J.


SEGAL, J.